## COMMONWEALTH FINANCE CORPORATION v. McHARG et al.

(Circuit Court of Appeals, Second Circuit. May 22, 1922.)

No. 193.

1. **Principal and agent ⬦69(1)—Agent cannot assume position, where own interest antagonistic to principal's.**

The relationship of principal and agent is most jealously guarded, and an agent will not be permitted to place himself in a position where his own interests may become antagonistic to those of his principal.

2. **Principal and agent ⬦69(4)—Agent cannot indirectly buy principal's property for himself.**

An agent authorized to sell cannot evade the law forbidding purchase of the property for himself by causing the property to be purchased ostensibly for another, but in reality for himself.

3. **Principal and agent ⬦69(4)—Where fraud appears in purchase by agent, immaterial that sale was public.**

It was immaterial that a sale of the property of a principal, which was purchased ostensibly for others, but in reality by the agent, was a public sale.

4. **Corporations ⬦314(2)—Rule against agent ostensibly purchasing property for another, but really for himself held to apply to officers and directors.**

The rule against an agent placing himself in a position antagonistic to the interest of his principal, and evading the law by causing property to be purchased ostensibly for another, but in reality for himself, to the prejudice of his principal, applies to officers and directors of corporations, who are regarded in courts of equity as trustees.

5. **Attorney and client ⬦123(1)—Attorney bound to exercise scrupulous good faith and fidelity to client's interests.**

It is the duty of an attorney, in all his relations to his client, to exercise the most scrupulous good faith and the highest degree of honor, integrity, and fidelity to his client's interests.

6. **Equity ⬦65(1)—One desiring relief in equity must be free from fraud.**

To call into action the processes of a court of equity, the right asserted must appeal to the conscience of the chancellor, and the one desiring relief must be free from fraud.

7. **Corporations ⬦317(3)—Officer fraudulently purchasing stocks held as trustee for corporation, and not entitled to reimbursement.**

Where an attorney for a corporation, who was also its secretary and treasurer and director, in violation of his obligation to the corporation, conceived a fraudulent plan through which he conducted the foreclosure and sale of defaulted stock subscription contracts, under Rev. Code S. D. 1919, § 8807, providing that the corporation was not entitled to bid, if there should be any other bidders to the extent of the assessments due and costs of the sale, and purchased the stock ostensibly for others, but in reality for himself, *held* to be the holder thereof as trustee for the corporation, and not entitled to reimbursement for any money expended in his attempt to defraud his principal and client.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Commonwealth Finance Corporation against Ormsby McHarg and others. From a decree granting insufficient relief, plaintiff appeals. Modified and affirmed.

The plaintiff is a corporation existing under the laws of the state of South Dakota, and the defendants are citizens of the state of New York and are residents of the Southern district thereof. The matter in controversy is 200 shares of the preferred stock and 89½ shares of the common stock issued by the plaintiff corporation, which stock exceeds in value the sum of $3,000. The suit is brought by the plaintiff to recover the stock on the theory that the defendants hold the stock as trustees thereof for the plaintiff.

From the time the plaintiff commenced business it sold its preferred stock to subscribers therefor upon contracts permitting them to pay for it in periodical installments; the subscribers being entitled to the stock only when all the installments were fully paid as provided in the contracts. The sales of the preferred stock were usually made at more than par, and it was the practice to give to persons subscribing and paying for the preferred stock a bonus of its common stock; the amount of the common stock so given as a bonus amounted in most cases to one-half the amount of the preferred stock purchased. If subscribers for stock defaulted in making the payments as they became due, the plaintiff adopted the policy of foreclosure of such contracts by advertising and selling such defaulted contracts at public auction, and would purchase for itself the contracts so offered and sold. This it did, it alleges, so that, if at any time any defaulting subscriber should come forward and desire to complete its contract, the plaintiff could be in a position to allow him to do so by paying the amount remaining due on the stock, and to receive his stock.

The defendant McHarg was a director in the plaintiff corporation, and its secretary and treasurer, and its general counsel during the times herein involved, and it is alleged had entire charge of the foreclosure and sale of all defaulted stock subscription contracts and the purchase thereof at such sales. It is alleged that McHarg, while thus representing the plaintiff and in charge of its foreclosure sale, conspired with the defendants, and in violation of his obligation to the plaintiff, conceived a fraudulent plan through which he conducted a sale of the stock involved, with the object of acquiring such stock for himself, although having it issued in the name of the other defendants. The defendant Stevens was the mother-in-law of McHarg. The defendant Benedict was a sister of his mother-in-law, and the defendant Fuller had a desk in the office of McHarg's firm. It is claimed that McHarg purchased the stocks with his own funds and had the stocks issued to the other defendants, representing them to be the bona fide holders of the said stock.

It is alleged that McHarg thus fraudulently procured the issuance to Benedict of 30 shares of the preferred stock in certificate 13,554, dated February 13, 1919, and to Stevens of 20 shares of preferred stock in certificate 13,702, of a like date, as well as 14 additional shares in certificate 13,704, and 29 shares of common stock in certificate 13,544, each of the date aforesaid. The stock in these cases was obtained as the result of a sale of certain contracts at public auction held on January 27, 1919. It is alleged that neither the said Stevens, Benedict, nor Fuller gave any value for any of said stock, but received the same with full knowledge of the plaintiff's rights therein, and each of them combined, confederated, and agreed with the said McHarg to use and permit the use of their names to conceal their conspiracy aforesaid, and to cheat and defraud the plaintiff of said stock, and to convert the same to his and their own use.

It is alleged, too, that through a sale of certain contracts at public auction on July 22, 1919, McHarg fraudulently procured the issuance to defendant Fuller of certificates numbered 17,472, 17,473, 17,474, 17,475, and 17,476, each for 25 shares of preferred stock, and certificate 17,477 for 11 shares of preferred stock; the aforesaid certificates being dated August 23, 1919. It is further alleged that certificates 17,439, 17,440, 17,441, 17,442, and 17,443, each for 11 shares of common stock, and certificate numbered 17,444, for 4 shares

of common stock and certificate 17,445 for ½ share of common stock (which last mentioned certificate was subsequently surrendered and certificate numbered 22,036 issued for 1 share of common stock), all dated August 23, 1919, were also issued to Fuller in like manner, Fuller giving no value for the stock, and being alleged to have full notice of the plaintiff's rights.

The defendants are each alleged to be insolvent, and the bill asked that the defendants be required to assign in writing the said certificates to the plaintiff, and deliver the same to the plaintiff that they might be transferred on the books. A decree is asked adjudging that the defendants hold the certificates of stock aforesaid as trustees for the plaintiff, and that the plaintiff is the equitable owner of the certificates, and entitled to have them assigned in writing and delivered and that each of them be decreed to pay to the defendant all dividends, with lawful interest thereon, which has been received and collected. An injunction was also asked restraining defendants during the pendency of the action from selling, assigning, transferring, or in any manner dealing with the certificates, except to transfer, assign, and deliver the same to the plaintiff.

The court below found that, while the stock was purchased in the name of the other defendants, McHarg was the real purchaser, and that the stock is now in his possession and control. The court therefore directed a decree to be entered providing for the return to the plaintiff of the stock in question, upon payment to McHarg and the other defendants, as their interest appeared, of the amount paid for said stock with interest thereon, less, however, such dividends as the plaintiff has paid upon the stock since the date of the sale, together with the interest on such dividends.

From this decree the plaintiff has taken this appeal.

George Edwin Joseph, of New York City, for appellant.

Edwin A. Carlin, of New York City, for appellees.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This case presents an interesting and important question. The defendant McHarg is an attorney at law, and was a member of a law firm composed of himself and one other; the firm being employed by the plaintiff as its counsel. As already stated, McHarg was also a director in the plaintiff corporation, as well as its secretary and treasurer during the time of the transactions complained of. At a meeting of the executive committee of the corporation, held at its office in New York City on December 31, 1918, McHarg, as treasurer of the corporation, submitted a list of delinquent subscribers to the stock of the corporation and recommended that appropriate action be taken immediately to forfeit their subscriptions. Thereupon resolutions were introduced declaring the subscribers named therein to be delinquent in the amounts specified therein, and directing the secretary of the corporation to notify the delinquents of the action taken, and authorizing, empowering, and directing him to sell so much of the said shares as were not theretofore redeemed at public auction to the highest bidder at a place named in the city of Pierre, S. D., on January 6, 1919. And it was also resolved that the plaintiff corporation should, at the said sale, bid in and purchase all or any part of said shares which it might be entitled to do under and in the manner provided by the laws of South Dakota. And it is to be kept in mind that the secretary, who was empowered to make the sale, was the same Mr. McHarg who is the defendant herein, and who was also one of the plaintiff's attorneys during the period involved.

It appears that under the laws of the state of South Dakota, the plaintiff being a South Dakota corporation, the plaintiff was not entitled to bid in the stock, if there should be any other bidders to the extent of the assessments due and the costs of sale. But, if no such other bidders appeared, then the corporation might itself buy in the stock. Revised Code of South Dakota, § 8807. Prior to the day fixed for the sale McHarg who was empowered to make the sale for his corporation and to buy in the stock for the corporation, in the contingency above mentioned, advised the assistant secretary in charge at Pierre that money had been paid to him in New York for the purchase of the stock and that it was to be bid in to the extent indicated in his letter of instructions and was to be issued in the names of the persons mentioned in such letter, the persons so mentioned being McHarg's codefendants in this suit.

The District Judge, in his opinion below, makes the following statement as to the facts:

"A consideration of all the evidence convinces me that the purchase of the stock here in suit was made for the benefit of the defendant McHarg. He was the secretary and treasurer of the plaintiff corporation, as well as a director, and one of its attorneys. It was under his instructions, pursuant to appropriate resolution of the directors, that the sale of the defaulted stock subscription contract was carried out. Nevertheless, under a pretense that the defendants Benedict, Stevens, and Fuller had supplied him with funds to bid in for their account a certain number of shares of plaintiff's capital stock, McHarg became the beneficial owner thereof. The fact seems to me to be so plainly established as to make unnecessary a detailed statement of the evidence whereon the finding is based."

We do not deem it necessary to review the testimony which appears in the record, although we shall, as we proceed, have occasion to refer to some portions of it. We have read the testimony with care, and it is sufficient now to say that it has made the same impression upon us that it made upon the District Judge. The defendant McHarg, whose law firm was employed as the plaintiff's legal advisers in respect to its legal business and presumptively, therefore, as to its foreclosure suits, and who in his individual capacity as secretary was empowered to make the sale of these stocks, stood in the relation of a fiduciary to this plaintiff.

[1] No principle is better established in the law than that loyalty to his trust is the first duty which every agent owes to his principal. It underlies all agencies. The law condemns as contrary to public policy any conduct in an agent which involves a breach of fidelity in that relationship which is most jealously guarded. An agent will not be permitted to place himself in a position where his own interests may become antagonistic to those of his principal. As was said in the Chancery Court of New Jersey in Porter v. Woodruff, 36 N. J. Eq. 174, 176, the law by which an agent is bound to regulate his conduct "is a law of jealousy." And an agent who is authorized to sell his principal's property certainly cannot, without his principal's consent, purchase the property for himself. Marsh v. Whitmore, 21 Wall. 178, 22 L. Ed. 482; Robertson v. Chapman, 152 U. S. 673, 14 Sup. Ct. 741, 38 L. Ed. 592. In Porter v. Woodruff, supra, the Vice Chancellor well said:

"The general interests of justice and the safety of those who are compelled to repose confidence, in others alike demand that the courts shall always inflexibly maintain that great and salutary rule which declares that an agent employed to sell cannot make himself the purchaser, nor, if employed to purchase, can he be himself the seller."

[2] And, of course, what the law does not permit an agent to do directly, it will not permit him to do indirectly. He cannot evade the law by causing the property to be purchased ostensibly for another, but in reality for himself. The court in all such cases looks behind the appearance in which the transaction has been clothed, and will decide the case in accordance with the naked facts, which it has been sought to cover up and conceal. Forbes v. Halsey, 26 N. Y. 53; Davoue v. Fanning, 2 Johns. Ch. (N. Y.) 257; Eldridge v. Walker, 60 Ill. 230; Merriam v. Johnson, 86 Minn. 61, 90 N. W. 116; Hughes v. Washington, 72 Ill. 84.

[3, 4]. In such cases it is needless to say that it is quite immaterial that the sale made is a public one. Harrison v. McHenry, 9 Ga. 164, 52 Am. Dec. 435; Perkins v. Thompson, 3 N. H. 144; People v. Township Board, 11 Mich. 222. And it applies to the officers and directors of corporations, who are regarded in courts of equity as trustees. Jackson v. Ludeling, 21 Wall. 616, 22 L. Ed. 492; Greenfield Savings Bank v. Simons, 133 Mass. 415; Cumberland Coal Co. v. Hoffman Steam Coal Co., 30 Barb. (N. Y.) 159.

[5] But it is to be kept in mind that McHarg was not merely an agent or a quasi trustee. He was also plaintiff's attorney. The law makes it the duty of an attorney to exercise in all his relations to his client the most scrupulous good faith and fidelity. He is bound to exercise the highest degree of honor, integrity, and fidelity to his client's interests. Cox v. Sullivan, 7 Ga. 144, 50 Am. Dec. 386; Pierce v. Palmer, 31 R. I. 432, 77 Atl. 201, Ann. Cas. 1912B, 181. The relation is one of peculiar and exceptional confidence, so much so that the courts have held that a gift made by the client to his attorney during the continuance of the relationship cannot be upheld, but must be declared to be absolutely void. Holman v. Loynes, 4 De G., M. & G. 270; Greenfield's Estate, 14 Pa. 489, 506; Morgan v. Minett, 6 Ch. D. 638, 646, in which Vice Chancellor Bacon declared that to give effect to a gift from the client to his attorney "that relation must be severed." In O'Brien v. Lewis, 4 Giffard, 221, it is held that a gift from a client to his solicitor is contrary to public policy, and therefore void. And in Wright v. Proud, 13 Vesey, Jr., 136, 138, Lord Erskine said that, independent of all question of fraud, an attorney cannot take a gift from his client while the relation subsists, though the transaction may be not only free from fraud, but the most moral in its nature. It is not necessary for us to inquire whether the rule announced in these cases in holding such a gift absolutely void under all circumstances was too extreme. We simply refer to them to show how scrupulously the courts have protected the client against the possibility of imposition and any unfairness, and how uberrima fides has been exacted.

We shall refer to Bulkley v. Wilford, 2 Cl. & Fin. 102, decided in the House of Lords in 1834, in illustration of the attitude of the courts towards an attorney who seeks to derive a personal advantage as re-

spects the property involved in the performance of the duties of the attorney in his relations to his client. In that case a client employed an attorney to levy a fine for the purpose of removing defects in the title on a contract for the sale of part of an estate. The attorney advised the levying of a fine of the whole of the vendor's estate, without telling the client of the effect of it. The vendor died without republishing his will previously made, by which he had devised the whole estate to his wife, who survived him; and after the vendor's death the attorney claimed the estate as his heir at law, alleging that the will was revoked by the fine, and he brought actions of ejectment to recover possession of it. The widow filed a bill in chancery for relief, and on an issue directed by the court a jury found that the attorney fraudulently omitted to tell the client what effect the fine would have upon a devise of the property. The Lord Chancellor entered a decree against the attorney being the heir at law and declared that he ought not to be permitted to take advantage of the fine, and required him to convey to the widow in fee the whole estate, and restrained him by injunction from prosecuting any action at law against her respecting the lands involved. The House of Lords affirmed the judgment. Lord Eldon's opinion in the House of Lords is of much interest. He stated that he had taken great pains to look into the subject, and that if he had been sitting to hear the case below "it would have been utterly impossible" for him to direct an issue to a court of law. He said:

"I should have thought it my duty, upon the principle which I am now about to state, at once to have said, 'Whether you meant fraud, whether you knew that you were the heir at law of the testator or not, you who have been wanting in what I conceive to be the duty of an attorney, if it happens that you get an advantage by that neglect, you shall not hold that advantage, but you shall be a trustee of the property for the benefit of that person who would have remained entitled to it, if you had known what you ought as an attorney to have known, and not knowing it, because you ought to have known it, you shall not take advantage of your own ignorance;' for I carry it so far, 'You shall not take advantage of your own ignorance.' It is too dangerous to the interests of mankind that those who are bound to advise, and who, being bound to advise, ought to be able to give sound and sufficient advice—it is too dangerous to allow that they shall ever take advantage of their own ignorance, of their own professional ignorance, to the prejudice of others."

And he went on to say that he would have entered the decree in the first instance without troubling himself at all about fraud—

"by applying the very principles which have been applied to trustees, to persons who are entrusted with the due management, in point of legal proceedings, of the property of others. * * * I say that there is principle enough in the policy of the law, as administered in courts of equity, to say he must be considered a trustee of that property on which the fine ought not to have been levied."

In the case now before us McHarg, as already noted, was not simply acting as an officer of the appellant corporation, but was employed by it in his professional capacity in respect to its business. The following is an interesting excerpt from his testimony:

"Q. You know that you were its attorney while you were acting? A. I was not its attorney. I was a member of the firm which was its attorney.

"Q. You were a member of the firm of McHarg & Metcalf? A. Yes; I told you that this morning.

"Q. Who were the members of the firm? A. I told you that this morning—myself and Mr. Metcalf.

"Q. And at that time was that firm counsel to the corporation, and were you one of the attorneys to the corporation? A. I was not, because I never advised the company in its affairs, never.

"Q. Was the firm of McHarg & Metcalf rendering bills to the company for services rendered? A. Yes; it did.

"Q. And you still say that you are not one of the attorneys for the company? A. I have stated to you the exact facts—the dealings between the Commonwealth Finance Corporation and my firm.

"Q. Did you not advise the company with respect to this very transaction concerning delinquent subscriptions? A. I did not, other than as the secretary of the company.

"Q. Do you differentiate to this court in this action between your capacity as attorney and your capacity as secretary? A. I do; there is a clean legal distinction.

"Q. And you want the court to understand that, in conducting this transaction for the corporation, you conducted it solely as secretary, and not as one of its counsel? A. I certainly do say so.

"Q. And that any remissness on your part, if any there would be, was solely as secretary, and not in your capacity as attorney?

"Mr. Carlin: I object to the form of the question.

"A. I have no objection to answering it, as there is an insinuation there I resent. I answer, 'Yes.'"

We confess our inability to make the distinction which Mr. McHarg undertakes to make, and to believe that in advising his corporation as respects the foreclosure sales he acted solely as secretary, and not at all as an attorney. He admits that he and one other constituted his law firm, and that the firm was the legal adviser of the corporation, but says that the junior partner "did all the advising in connection with the matters of the company." But as a lawyer he knows that the acts of the other member of his firm, done in relation to and in the course of the regular business of the firm, are the acts of the firm itself, and therefore of himself. The bills rendered to the corporation for legal services were rendered, not in the individual name of his associate in the firm, but in the firm name. At the very meeting of the executive committee at which McHarg was present, and at which he was authorized as secretary to institute the foreclosure proceedings and sell the shares, the following resolution was passed:

"Resolved, that the bills of McHarg & Metcalf for legal services and expenses for the months of September, October, and November, 1918, be approved, and the action of the officers of the corporation in paying the same be in all respects ratified and confirmed."

If we were able to accept this statement as correct, that he gave no legal advice to his corporation, although his firm was employed as its attorneys, we do not see that that fact would alter his relation to the transactions herein involved in the slightest degree.

This brings us to inquire more particularly into the conduct of McHarg in his dealings with this plaintiff corporation of which his firm was legal adviser, with the view of ascertaining whether his conduct must be regarded not merely constructively, but willfully, fraudulent. In this connection the testimony of the defendant Fuller may be re-

ferred to. As already mentioned, Fuller is an attorney, and in 1918 and 1919 he had his office in the offices of McHarg's firm, although not a member of it. He testified that he remembered in 1919 having a conversation with McHarg in reference to the stock herein involved. He was asked as to this conversation, and testified as follows:

"Q. What was it? A. He said to me that he would like to buy some stock of the Commonwealth Finance Corporation in my name, and asked me if I had any objections, and I told him I had not."

His testimony also shows that some weeks or months after he received at his home certain certificates of stocks, which he brought in the very next day, indorsed in blank, and turned them over to Mr. McHarg's secretary; that he never paid any money, and had no interest of any kind or character in the certificates standing in his name; that the dividend checks for the stock were sent to him, and his recollection was that in most instances he indorsed them over and handed them to McHarg's secretary direct; that in one or two instances he might have deposited them in his own account and drawn a check against them, and, if he did, he presumed that such check was to Mr. McHarg's order, but he could not swear to that. Notwithstanding the fact that Fuller had paid no money to McHarg for the purchase of this stock, McHarg informed the assistant secretary in the company's office in South Dakota that the money had been paid to him for the purpose of paying for the stock, and that a certain number of the shares were to be issued in the name of Fuller. Afterwards the official report of the sale was sent to him. It contained the following statement:

"That the money for the purchase of these stock subscriptions was deposited prior to this sale at the branch office of this company, in New York City, in accordance with the word received from New York City from the officials of said company. That the said Charles Fuller was the highest and best bidder for the said subscription agreements, and said subscription agreements were struck off and sold to him as such highest and best bidder."

This was called to McHarg's attention while he was on the stand as follows:

"Q. That states the facts? A. No; it does not. Mr. Fuller himself was not the bidder.

"Q. You received this report? A. Yes.

"Q. Did you correct it? A. I did not.

"Q. And you say that Mr. Fuller was not the bidder? A. Technically, he was not a bidder, in the sense that it is a technical interpretation of the word. It was an offer of the amount due on the subscription, with cost, accepted by me as the secretary of the company conducting the sale.

"Q. Do you state it was a direct statement of facts that this stock was sold to Charles Fuller? A. His name was used solely for the purpose of the purchase.

"Q. Will you answer my question? Was it a statement true in fact, that the stock referred to and described in Plaintiff's Exhibit No. 3 was sold to Charles Fuller? A. Only in a technical sense.

"Q. What do you mean by 'only in a technical sense'? A. Simply because his name was used as the purchaser of the stock.

"By the Court: Q. Simply as a dummy; his name was used as a dummy? A. Yes.

"By Mr. Joseph: Q. Who selected him as a dummy? A. I selected him.

"Q. And he was your dummy? A. He was not my dummy.

"Q. Whose dummy was he? A. C. T. Stevens', the person who furnished the money.

"Q. So you say C. T. Stevens was the person who furnished this money? A. Exactly.

"Q. And there is no doubt about that in your mind? A. Not the slightest."

Mrs. Stevens was Fuller's mother-in-law. If the money used was the money of Mrs. Stevens, it is remarkable that the dividends paid to Fuller, and by him paid over to McHarg, were deposited by him in his personal bank account, and that they were so deposited McHarg admitted. He was also asked and testified as follows:

"Q. Was the arrangement by which this stock was to be purchased in the name of Mr. Fuller for Mrs. Stevens a matter of conference with or by her advice or suggestion? A. No; I would say not. I assume I did it just as I did any other business for her. She had trusted me to do these things, and I have done them, as I say."

McHarg further testified as follows:

"Q. Did you tell her [Mrs. Stevens] you were going to buy the stock in the name of Charles Fuller for her? A. I assume I did. If you ask me if I put the statement to her, the question to her that way, I cannot say.

"Q. I would like an answer, if you can recall? A. I cannot recall. The fact is that I did.

"Q. Did you have any particular reason for putting Mr. Fuller's name in for your mother-in-law's benefit? A. I cannot think of any reason, no.

"Q. Your mother-in-law at that time was already a stockholder in her name, was she not? A. She was.

"Q. Can you give us any reason why you did not continue to purchase stock in her name, if the Fuller stock was purchased for her? A. I cannot give you any reason. It is a long time ago, and I do not know."

McHarg was shown a dividend check for $1,000 on common stock which stood in the name of C. T. Stevens (his mother-in-law) and a co-defendant herein, and indorsed over to him, and he stated it was indorsed over to him because he had an interest in the stock. Other dividend checks payable to Mrs. Stevens were produced, which were indorsed by her to Grace S. McHarg. His testimony as to these checks was as follows:

"Q. (continuing). Here is another check indorsed by Mrs. Stevens over to Grace S. McHarg. A. I do not know what the reason was.

"Q. Who is Grace S. McHarg? A. Grace S. McHarg is my wife. I have no means of knowing why that was indorsed to Mrs. McHarg.

"Q. I am not inquiring into that for the moment, but does this dividend check indorsed to Mrs. McHarg represent the dividend check on the stock involved in this action? A. I do not know. I do not know anything about it."

While he claimed to be handling the moneys of Mrs. Stevens he admitted that he had no book, memorandum, check stub or voucher of any sort to show the court a single dealing between himself and Mrs. Stevens or to show that the money he claimed that he used to buy the stock, in her name and which he took out of his own bank account belonged in fact to her and was not his own. He said that if his method of doing business was a careless one: "She is the one to find fault with it. She has not yet."

He testified:

"I kept no books at all. The transactions were carried on and closed up, and I kept no books of my own. The only books I ever kept in my office

were firm books. I keep no books of my own; never have. I have no bookkeeper."

We shall not go further into the testimony as respects the stocks ostensibly purchased by McHarg in the names of his mother-in-law and of his mother-in-law's sister, as the court below, who saw and heard Fuller give his testimony, has found it "plainly established" that the use of their names was a "pretense," and that McHarg was in reality the beneficial owner of the stocks, in all of which we concur. Such being the case, it is clear that the defendants are not entitled to hold these stocks, but must be regarded as constructive trustees of the same for the appellant.

A court of equity relieves against fraud by converting the person who practiced the fraud into a trustee for the defrauded party. It does not permit a person guilty of fraud to profit by his own wrong, but declares him to be a trustee, and will compel him to transfer the legal title. See Kerr on Fraud (5th Ed.) p. 418.

This makes it necessary to determine whether McHarg is in a position which entitled him to demand that the appellant pay over to him the amount paid in the purchase of the stock, together with the interest thereon, less the dividends received, as a condition of the relief to which it is clearly entitled, the transfer of the stock to it. The court below in its opinion said:

"Finding, as I do, that McHarg was the real purchaser of the stock, that the same is now in his possession and control, a decree may be entered herein which will provide for the return to plaintiff of the stock in question upon the payment to McHarg and the other defendants, as interest may appear, of the amount paid for said stock with interest thereon, less, however, such dividends as the plaintiff has paid upon the stock since the date of the auction sale thereon, together with interest on such dividends."

[6] We cannot concur in the conclusion that McHarg is entitled to be reimbursed for the amount paid for the stock and interest thereon. This is a court of equity and such a conclusion does not commend itself to the conscience of the court. And we must add that the conclusion is contrary to sound public policy. A suitor whose hands are unclean in respect to the transaction involved is in no position to ask the aid of the court for any assistance. It is an established maxim of equity that "he that hath committed inequity shall not have equity." If one desires relief in equity, he must be free from fraud. To call into action the processes of a court of equity, the right asserted must appeal to the conscience of the chancellor. In Dewesse v. Reinhard, 165 U. S. 386, 390, 17 Sup. Ct. 340, 341 (41 L. Ed. 757), it was said:

"A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, * * * he will be held remediless in a court of equity."

And in such a case we think a defendant who asks affirmative relief is in no better position than is a plaintiff. In Henyan v. Trevino, 137 S. W. 458, decided by the Court of Civil Appeals of Texas in 1911, an attorney, while acting for his clients, attempted to overreach them by fraudulently buying in certain property by paying the taxes and through the tax title acquiring title for himself. Henyan was an attorney em-

ployed by certain persons to represent them in respect to certain land litigation. The land was sold at a sheriff's sale and bought in by the attorney for $73.50, and he took title in his own name; the land being alleged to be of the reasonable value of $20,000. He also claimed that he had purchased the property for himself at a tax sale, and not in trust for any one else. The bill was filed by the plaintiffs, on the theory that Henyan at the time of the transactions complained of was employed by them as their attorney and agent, and therefore acquired title in trust for them. The court held the attorney estopped from denying his clients' title and his trusteeship for their benefit, and that a court of equity would compel an attorney to convey to his clients land to which they had the equitable title under his dealings in their behalf, and that in requiring him to convey the title he was not entitled to any allowance for taxes paid on the land in controversy. A rehearing was sought on the ground that it was fundamental error not to allow him anything for the taxes he had paid. The court, in denying the motion for a rehearing, said:

"The uncontroverted evidence shows that, while he occupied the relation of attorney towards the appellees, in his endeavor to overreach and defraud them of their interest in the lands which it was his sacred duty to protect, he paid the taxes, not for them, but sought, through the medium of such payment, to acquire title to all their interest in the land and hold it adversely to them. Convicted of this fraud by the verdict of the jury, he now says to a court of justice: 'You erred in not compelling my clients to pay me money which I used in an effort to defraud them out of the interest in property, which it was my duty, as their attorney to protect them in.' Courts of conscience will do no such things."

In Manning v. Hayden, 16 Fed. Cas. 645, No. 9,043, an attorney who purchased for himself his client's property at a judicial sale paid therefor $1,125. The circumstances showed conclusively actual fraud. The court held the attorney as a constructive trustee for the client, and entered a decree requiring him to convey the premises within 60 days and pay the costs of the suit, and no provision was made for repayment of the money paid by him in the acquisition of his title.

Doster v. Scully (C. C.) 27 Fed. 782 (1886), is an illuminating decision on the question under consideration. The case was decided by Judge Brewer, then a Circuit Judge, but afterwards a Justice of the Supreme Court of the United States. The case shows that where an attorney acts fraudulently in buying in property in which his client was interested the purchase inures to the benefit of the client, and that the attorney forfeits the money he paid; whereas, if the attorney acts honestly, yet ignorantly and mistakenly, the law treats him as an agent for his client, and as holding for the benefit of the client, but he does not forfeit the money expended. Judge Brewer's statement of the law is as follows:

"That an attorney is bound by the advice which he gives his client, and that, having given advice of a certain character, he cannot thereafter deal with the property, the subject-matter of the advice, to his own personal gain, and the prejudice of the client who has acted upon his advice. His claim is: 'Mr. Doster said to me that that mortgage was an inferior lien to the attachment. I relied upon that advice, bought the land, and now Mr. Doster cannot turn round, buy that mortgage for a song and foreclose it against my land.' Well, the proposition of law is beyond any question. There is such an obligation resting upon a lawyer to his client that, while he does not in-

sure the correctness of his advice, yet, after having given it, he is estopped from speculating upon it to the injury of his client. Of course, the question arises in two forms. It may be a case where the counsel knowingly and intentionally gives false advice with a view of personal speculation thereafter. In such a case as that the law is emphatic that he takes nothing by his subsequent speculation, that he forfeits the money he has paid, and that all inures to the benefit of the client. The other case is where a lawyer, ignorantly and mistakenly yet honestly, gives advice, and thereafter enters upon a speculation in respect to the property of the subject-matter of the advice and there the law treats him as an agent of his client, and holds his speculation as only for the benefit of the client. There would not be any dispute, I presume, among members of the bar generally, as to the correctness of these propositions of law, and the necessity of strict adherence to them in all cases. It is the foundation of the confidence which ought to exist between counsel and client, and which can alone enable counsel to act freely and fully for the benefit of the client."

In Railroad Co. v. Soutter, 13 Wall. 517, 523, 20 L. Ed. 543, Mr. Justice Bradley, writing for the court, declared that a fraudulent purchaser of property could not recover for incumbrances lifted by him whilst in possession. He added:

"If such a case can be found in the books, we have not been referred to it. Whatever a man does to benefit an estate, under such circumstances, he does in his own wrong. He cannot get relief by coming into a court of equity. * * * One of the maxims of the latter system is: 'He that hath committed inequity shall not have equity.' "

The law is perfectly well established that, where a party to an illegal contract pays money to the other party to it in pursuance of the contract, he cannot even in a court of law recover it back. And this principle rests on the ground of public policy. Harse v. Pearl Life Assurance Co., L. R. [1904] 1 K. B. 558, 563. And for the same reason money paid in furtherance of fraud cannot be recovered. Kerr on Fraud (5th Ed.) p. 467. And for a like reason one wrongdoer cannot have contribution from the other tort-feasor in cases where he must be presumed to have known that he was engaged in an unlawful act. He is left by the law where his wrongful action has placed him. Cooley on Torts, 148.

[7] The stock which McHarg was authorized by the plaintiff to sell did not belong absolutely to the appellant corporation. At the foreclosure sale which McHarg was authorized to institute, the appellant corporation had no right to buy the stock under the laws of South Dakota, when it was put up for sale, unless no one appeared to bid as much as the amount of the unpaid subscription then due, plus the expenses. And if that situation developed, it was plainly McHarg's duty to see that the stock was then bought in for the corporation. Now, what McHarg did was to prevent the corporation from becoming the owner of the stock, by procuring "dummies," to bid just enough to deprive the corporation of its rights to purchase, and of the advantage which would have accrued to it by such purchase, in that it would retain the amount which had been previously paid thereon by the delinquent subscriber. The object of McHarg's conspiracy was so contrived as to prevent the corporation from securing for itself the amounts already paid on the stocks, while not depriving it of the amount of the unpaid balance due, and to obtain that profit for himself. The scheme was undoubtedly a

dishonest one, and involved a distinct breach of the trust reposed in him by his corporation, whose agent and attorney he clearly was. Under the circumstances he must be regarded as holding the stocks he thus secured as the trustee for the corporation. He must turn them over to the corporation, and is not entitled to reimbursement for any money he expended in his attempt to defraud his principal and his client.

The decree is directed to be modified, by striking therefrom the provisions directing the payment of the moneys therein ordered to be paid to the appellees, and is affirmed as to the remainder thereof, with the costs in both courts to be paid to the appellant.