Vulcanized Rubber & Plastics Company *v.*
Scheckter, Appellant.

Argued April 19, 1960. Before Jones, C. J., Mus-
manno, Jones, Cohen, Bok and Eagen, JJ.

406

*David H. H. Felix,* with him *Benson Zion,* and *Felix & Felix,* and *Curtin & Heefner,* and *Verrill, Dana, Walker, Philbrick & Whitehouse,* of the Maine Bar, for appellants.

*William T. Coleman, Jr.,* with him *Aaron M. Fine, Harold E. Kohn,* and *Dilworth, Paxson, Kalish, Kohn & Dilks,* for appellee.

OPINION BY MR. JUSTICE COHEN, June 29, 1960:

On August 20, 1959, the appellee corporation moved for and was granted a temporary order restraining the appellants, two of whom had been both lawyers and accountants of the appellee and a third a former director, from voting any of appellee's stock owned, held or controlled by appellants at any future stockholder's meeting. After holding several hearings, the chancellor, finding that certain stock was acquired by appellants in breach of their fiduciary responsibilities, decreed that the restraining order be continued as a preliminary injunction pending final hearing and determination of the case. From this order appellants have taken these appeals.

The instant suit involves another round in the struggle between the present management group of the appellee, Vulcanized Rubber & Plastics Company, and a group headed by the individual appellants, Scheckter,

Fish and Redland, for managerial control of the appellee corporation.[1]  The appellee, a Maine corporation

[1] The contest became an open one in December, 1958, when appellants Scheckter and Fish demanded that two vacancies on the board of directors of appellee be filled with their nominees but were refused.  Then, on June 8, 1959, they informed appellee that they controlled 50% of its outstanding common stock and demanded that three members of the board of directors resign and the vacancies be filled by their nominees, to give them control of six members of the nine member board.  Again refused, the appellants, on June 30, 1959, purportedly pursuant to a Maine Statute, held a meeting of certain of appellees' stockholders; voted to increase the number of directors to 18 and elected 9 new ones consisting of themselves and their nominees; caused the new directors to oust the appellees' president and general manager, as well as the chairman of its finance committee, and appointed their own nominees, making appellant Redland president.  By order of the Supreme Judicial Court of Maine, a preliminary injunction was entered on July 30, 1959, declaring that the stockholders' meeting of June 30 was invalid, and that all proceedings taken at the meeting were void.  Appellants then brought a mandamus action in Maine seeking to compel appellee to call a stockholders' meeting for the purpose of increasing the board of directors.  A written stipulation was then entered into between the parties on July 30, 1959, whereby a consent decree invalidating the stockholders' meeting of June 30 was issued and the mandamus action withdrawn, and both sides agreed to hold a special stockholders' meeting in Portland, Maine, on August 24, 1959, for the purpose of voting on a motion to amend the by-laws of appellee to increase the size of the board of directors.  On August 20, the appellee moved for the temporary restraining order in this suit, which deprived appellants of their voting rights until at least the hearing which was set for August 25, 1959, the day after the agreed upon date for the special shareholders' meeting.  Despite the temporary order appellants voted their shares at the meeting on August 24, but upon threat of contempt proceedings revoked their action at the meeting.  In the meantime, the management group on August 21, at a board of directors meeting, by a divided vote, agreed to issue 3,000 shares of common stock to Plastic Company, a corporation formed the day before, in exchange for a piece of real estate in Trenton, New Jersey.  The management group, before this date, had given options for all of their and their family shares in the appellee to the man who controlled Plastic Company.  Apparently, if the

with its business office in New York City and its factory in Morrisville, Pennsylvania,[2] is engaged in the manufacturing of rubber and plastics products. The appellants Scheckter and Fish, practicing lawyers and certified public accountants in Philadelphia, were employed by the appellee as tax counsel from 1944, and as accountants through their partnership in King and Company and King, Marryat and Company from 1951 until their discharge in June, 1959. In that period of time, through their various firms, they billed the appellee corporation in excess of $50,000 for professional services.

The chancellor found that from about March 1, 1956, until approximately the commencement of this action, a Weatherly Steel Castings Company and its successor, the appellant Dutron Plastics, Inc., made numerous purchases of the appellee's common stock, causing the price of the stock to increase from about $25 per share to more than $60 per share. Throughout

---

transaction is consummated, the ownership of a majority of shares will again shift. Its accomplishment, however, has been stayed temporarily by the appellants by legal proceedings in Maine.

[2] The appellants raise (but do not seriously press) objections to the lower court's assuming jurisdiction on the grounds that to do so would result in the court's interfering in the internal affairs of a foreign corporation. Where the complainant is the foreign corporation suing for relief from alleged wrongs against the corporate entity itself, such a plea is without merit. Cf. *Plum v. Tampax, Inc.*, 399 Pa. 553, 160 A. 2d 549 (1960). A more difficult problem which confronted the court, though not raised nor briefed by the parties, was whether because the appellee is a Maine corporation with its business office in New York a question of the proper choice of law exists. After an examination of the record we remained unsure of whether the allegedly wrongful conduct of the defendants all occurred in Pennsylvania. Since, however, the parties did not see fit to question the application of Pennsylvania law, we infer that this state was in fact the situs of most of the allegedly wrongful conduct and accordingly decide the issues of fiduciary responsibility on the basis of our own law.

this period, appellants Scheckter and Fish held majority control of both Weatherly Steel Casting Company and Dutron Plastics. They did not reveal their interest in these companies to the appellee, however, even though they were requested to supply this information on at least one occasion by the appellee's New York counsel and earlier, by one of appellee's officers and directors. Until December, 1958, the appellee corporation had no conclusive knowledge that the appellants Scheckter and Fish were connected with either company, nor did appellee learn that these appellants owned the controlling interest in the companies until the time of the hearing in this matter.

The chancellor next found that during the period in question, in which appellants' interests were for the most part unknown to appellee, both the appellee and the "Vulcanized Stock Syndicate" were attempting to buy appellee's common shares. The "Vulcanized Stock Syndicate" was an organization composed of directors, officers, and employees of the appellee corporation. Created in July, 1949, by a written agreement signed by the members, the syndicate's avowed purpose was to purchase stock of the appellee when it appeared on the market at favorable terms. Complete control and management of the syndicate was vested in the "syndicate managers", Stanley H. Renton, a director and chairman of the finance committee of the appellee, Prescott Beach, then an officer of the appellee, and appellant Redland, a director and treasurer of the appellee for twenty years until June, 1959, when he also was discharged. Appellant Scheckter, although not an officer, director or employee of the corporation, was allowed to be a member of the syndicate because apparently the plan was primarily his idea and suggestion. While the finding is vigorously disputed, the chancellor found that the syndicate agreement was

drafted by Scheckter himself in July, 1949. He also found that the members of the syndicate had some "gentlemen's agreement" that they would not purchase appellee's stock individually, but only through the syndicate.

Specific instances of competitive purchases mentioned by the chancellor included a purchase by the Weatherly Steel Casting Company of a Mr. Smith's shares in disregard of a written contract between "Vulcanized Stock Syndicate" and Mr. Smith to purchase his shares, and a purchase by appellant Redland of 673 shares from Mr. Beach in June, 1959, which shares Mr. Renton was purportedly attempting to purchase for the corporation. This latter purchase was apparently financed by appellants Scheckter and Fish and is substantially the basis of appellee's charge against appellant Redland of allying himself with the other appellants and conspiring with them in breach of his fiduciary position with appellee in order to overthrow appellee's management and control.

On the basis of these findings the chancellor concluded that Scheckter's and Fish's purchases, both individually and through the corporation they controlled, as well as those of Redland, whom the chancellor found to be in conspiracy with Scheckter and Fish, were all consummated in competition with the interests of appellee corporation. The chancellor accordingly issued a preliminary injunction on the ground that appellee had shown a breach of fiduciary duty for which it was entitled to relief.

The limits of our review of the action of a chancellor in issuing a preliminary injunction are to see if the chancellor had apparently reasonable grounds for doing so. We do not further consider the merits of the case or pass upon the reasons for or against such action unless it is plain that no such grounds existed or that

the rules of law relied upon are palpably wrong or clearly inapplicable. *Rubin v. Bailey,* 398 Pa. 271, 157 A. 2d 882 (1960); *Herman v. Dixon,* 393 Pa. 33, 36, 141 A. 2d 576 (1958). But at the same time the complainant must establish that it is his clear legal right, not doubtful or uncertain, to the specific relief sought; otherwise the preliminary injunction will be dissolved. *McDonald v. Noga,* 393 Pa. 309, 141 A. 2d 842 (1958); *Herr v. Rumisek,* 303 Pa. 9, 153 Atl. 728 (1931). Particularly so where, as here, the complainant is a corporation for which a struggle for control exists. We must assure ourselves that the right is that of the corporate entity itself, and not some colorable right which allows the present "in" group to use the power and finances of the corporation to enhance their own position in the contest.

Appellants' principal contention is that the appellee corporation has suffered no legal wrong and was therefore not entitled to the issuance of the preliminary injunction. Our inquiry is thus limited to reviewing the chancellor's theory of the legal wrong done to the appellee, and determining whether there exists a reasonable basis in the record to support his conclusions.

The chancellor issued the preliminary injunction because he concluded that the appellants, as lawyer, accountant or director, breached their fiduciary duty to the appellee by buying certain stock in which both the appellee corporation and the stock purchase syndicate were interested without ever informing the appellee or the syndicate managers that they were going to buy the stock, or offering to either the opportunity of first purchasing the stock. Generally speaking, a corporation as such has no interest in its outstanding stock, or in dealings by its officers, directors or shareholders with respect thereto. *Howell v. McCloskey,* 375 Pa. 100, 99 A. 2d 610 (1953); *Bisbee v. Midland*

*Linseed Products Co.,* 19 F. 2d 24 (8th Cir. 1927). As a result, in and of itself, there can be nothing improper so far as the corporate entity is concerned with one of its fiduciaries, be he officer, director or otherwise, buying up a controlling number of shares. *Howell v. McCloskey,* supra; *Commonwealth Title Insurance & Trust Co. v. Seltzer,* 227 Pa. 410, 76 Atl. 77 (1910). Cf. *Keely v. Black,* 91 N. J. Eq. 520, 111 Atl. 22 (Ct. Err. & App. 1920). Nor can it be of any consequence, therefore, if the control is secretly acquired (which, as a practical matter will usually be the case, for to do so otherwise will result in a rise in the market price).

On the other hand, if there should exist some reason or necessity for the corporation to purchase its outstanding shares, the situation is necessarily altered. There is no doubt that the relationship between a corporation and its officers and directors, as well as its lawyers and accountants, is such that these "fiduciaries" cannot act contrary to or compete with the interests of the corporation. Predominantly for the protection of shareholders,[3] there has developed in corporation law a doctrine of "corporate opportunity" under which a corporation has the right to legal redress where one of its fiduciaries has in some way usurped some advantageous opportunity in which the corporation has an existing interest or where the opportunity is necessary for corporate existence or prosperity. *Commonwealth Title Insurance & Trust Co. v. Seltzer,* supra; *Guth v. Loft, Inc.,* 23 Del. Ch. 255, 5 A. 2d 503 (Sup. Ct. 1939).

It becomes evident that the basis of appellee's action here must be that the appellant fiduciaries, in purchasing the stock in issue, regardless of the secrecy in doing so, have acted in competition with some existing

---

[3] See Note, 104 U. Pa. L. Rev. 424, 426 (1955).

corporate interest in the stock, or have pre-empted a corporate purchase which was necessary for the appellee's prosperity or existence. Since the chancellor based his decision on the ground that the appellee had an interest in the stock, our inquiry is narrowed to determining whether the chancellor had before him a reasonable basis upon which to conclude that such a corporate interest existed.[4] Upon an examination of the record, and upon analysis of the applicable doctrines of corporate law, we find that the appellee corporation, as a corporate entity separate and apart from its management group, had no interest in purchasing the stock in issue, nor did it have any corporate interest or connection with the Vulcanized Stock Syndicate which could result in the appellee being legally harmed by the conduct of the appellants.

---

[4] Little argument could have been made that a purchase by the appellee of the common stock in issue was necessary for the appellee's existence or prosperity. Manifestly, any notion that a corporation has a need to purchase its own common shares for prosperity purposes is totally repugnant to basic corporate theory, and our own research failed to disclose, nor were we cited to, any authority which might suggest anything to the contrary so far as a Maine corporation is concerned. Similarly, while there could be situations in which the existence of the corporation might be threatened by the purchase of control, as where the group seeking control intends to use the power of control to "loot" the corporation, compare *Perlman v. Feldmann*, 219 F. 2d 173 (2d Cir.), cert. denied, 349 U.S. 952 (1955); *Insuranshares Corp. v. Northern Fiscal Corp.*, 35 F. Supp. 22 (E.D. Pa. 1940); *Commonwealth Title Insurance & Trust Co. v. Seltzer*, 227 Pa. 410, 76 Atl. 77 (1910), which might. then give rise to a corporate need to first purchase outstanding shares of common stock so as to prevent a shift in control to the potential looters, nothing of this nature was pleaded by the appellee, nor appears in the record. On the contrary, there is some indication in the record that the appellants' intentions in seeking control were to protect their minority investments by rehabilitating the apparently dwindling prosperity of the appellee.

It is clear from his opinion that the chancellor based his finding that the appellants' purchases of common stock were in competition with the appellee on the basis of the testimony of Mr. Werner, the present president of the appellee, that the corporation would have purchased the stock as it came on the market had it not been quickly purchased by Weatherly and Dutron at bids substantially higher than those the corporation could make, and on the basis of the testimony of Mr. Renton, chairman of the appellee's finance committee, that on the day prior to the appellants' purchase of 673 shares owned by Prescott Beach, he, Mr. Renton, had conceived of and offered to Mr. Beach for consideration a plan whereby the corporation would purchase the stock from Mr. Beach and make payments over a period of years. The legal error of the finding is in equating the individual intentions of Mr. Werner and Mr. Renton, but two of the nine directors of the corporation, with the intention of the corporate appellee. The separate expressions or opinions of members of the board of directors do not in law amount to an "existing interest" by the corporate entity itself. What is necessary is some affirmative action by the corporate organization which will disclose a corporate purpose, reason and program. A resolution by the board of directors will suffice. See *Howell v. McCloskey*, supra; *Irving Trust Co. v. Deutsch*, 73 F. 2d 121 (2nd Cir. 1934); *Kimmell v. Geeting*, 2 Grant 125 (1853).

Significantly, the record discloses that the corporation's history was one of not having ever purchased any of its own shares, that for the corporation to have made any purchase during the period of alleged competition would have necessitated making arrangements with a bank because of certain restrictions flowing from a loan arrangement, and that the financial situation of the corporation was such that a program of purchasing

might have been burdensome. In these circumstances, some authoritative action by the board would have been necessary for the corporation to have been interested in the shares, if only to proclaim a policy of corporate purchase and to resolve the problems and practical limitations faced by the corporation in making such purchases. Under the appellee's own by-laws,[5] as well as the law of Maine, this would have required action by the directors acting as a board, and not singularly. *Peirce v. Morse-Oliver Bldg. Co.*, 94 Me. 406, 47 Atl. 914 (1900); *Morrison v. Wilder Gas Co.*, 91 Me. 492, 40 Atl. 542 (1898); Maine Rev. Stat. 1944, c. 49, §22. There being no indication in the record that the board of directors as a body ever considered purchasing any stock,

---

[5] . . .

"Article II. Section 1. The property and business of the corporation shall be managed and conducted, and its affairs administered, by a Board of nine (9) Directors. . . .

"Section 4. At all meetings a majority of the board shall be necessary and sufficient to constitute a quorum for the transaction of business. . . .

"Section 10. In addition to the powers and authorities by these by-laws expressly conferred upon them, the board may exercise all such powers of the corporation, and do all such lawful acts and things, as are not by statute or by these by-laws directed or required to be exercised or done by the stockholders.

"Section 11. Without prejudice to the general powers conferred by the last-preceding section, or to the other powers conferred by statute or by these by-laws, it is hereby expressly declared that the board of directors shall have the following powers:

"(a) From time to time to make and change rules and regulations for the management of the corporation's business and affairs.

"(b) To purchase or otherwise acquire for the corporation, any property, rights or privileges which the corporation is authorized to acquire, at such price or consideration, and generally on such terms and conditions as they may deem best; and at their discretion to pay for any property or rights acquired by the corporation either wholly or partly in money, stock, bonds, debentures or other securities of the corporation."

there could not be any existing corporate interest therein. Accordingly, it cannot be held that appellants' purchases were in competition with the corporation itself.

The competition, if any, existed between the stock purchasing syndicate and the appellants. There are ample grounds in the record upon which the chancellor could have concluded that had not the appellants bid and raised the price, the syndicate would have purchased the stock. Our concern, however, is in finding the link between the syndicate and the appellee which results in the corporation being harmed by these competitive purchases.

The self-styled "Vulcanized Stock Syndicate" was a hybrid voting trust-stock purchasing pool. As previously stated, its members were all officers, directors or employees of the appellee, except for appellant Scheckter. Each subscribing member would pay in so much money per year, and with the resulting fund the syndicate would purchase any shares of the appellee that appeared on the market upon terms satisfactory to the syndicate managers. In resemblance to a voting trust, the syndicate agreement provided that the syndicate was to have a life of not more than ten years, and gave to the named syndicate managers or their successors absolute control of the stock purchased, including voting control. Not only was the appellee *not* a party to this agreement, but the agreement expressly provides as follows: "(f) It is understood and agreed by and between each and all of the parties that this is a personal agreement between the signatories hereto and that it is not in any way connected with or binding upon Vulcanized Rubber and Plastics Company with relation to the employment of any of the undersigned.

"(g) It is also understood by and between each and all of the parties hereto that there is no moral or legal

undertaking which would obligate any of the parties hereto to help perpetuate any of the parties to this agreement in their employment by said Company, it being further understood and agreed that all matters regarding the employment of the undersigned by said Company rests entirely within the discretion and judgment of the Board of Directors of said Company."

In spite of the express disclaimer of any corporate connection with the syndicate, and in spite of the fact that there were no funds of the corporation involved or any commitment by the corporation so far as managing the syndicate or shaping its policies, the appellee seeks to establish a protectable interest on the theory that the record shows that one of the purposes of the syndicate was to enable key employees of the appellee to purchase stock and thereby increase the morale of the employees. We, however, are not cited to any authority or offered any acceptable rationale, which might indicate how a voting syndicate has any corporate purpose[6] or how the incidental benefit derived from the key employees being able to purchase the stock in any way results in the corporation being harmed when the syndicate's purchases are thwarted. Compare *DuPont v. DuPont*, 256 Fed. 129 (3rd Cir. 1919). Certainly the potential harm of demoralization of these key employees is too tenuous to give rise to a claim for equitable relief enjoining voting rights of

---

[6] At oral argument we requested counsel for appellee to supply the Court with some authority which might indicate how the "Vulcanized Stock Syndicate" had a corporate purpose. In his accommodating letter to the Court, counsel directs our attention to the cases of *Janney v. Philadelphia Transportation Company*, 387 Pa. 282, 128 A. 2d 76 (1956) ; *Boyer v. Nesbitt*, 227 Pa. 398, 76 Atl. 103 (1910) ; *Holthusen v. Edward G. Budd Mfg. Co.*, 53 F. Supp. 488 (E.D. Pa. 1943) ; and *Commonwealth Finance Corporation v. McHarg*, 282 Fed. 560 (2nd Cir. 1922). We find that none of the cases are concerned with the problem.

appellants and charging them with a constructive trust. Moreover, it would seem that if the wrongful action of the appellants was in purchasing in competition with the syndicate, the right to charge the appellants as trustees ex malificio and claim the shares under a constructive trust would lie with the syndicate members themselves. *Shannon v. Baltz*, 398 Pa. 431, 158 A. 2d 558 (1960).

Having found no corporate interest in purchasing the stock in issue, nor any connection between the Vulcanized Stock Syndicate and the appellee which gives rise to the corporation being harmed by the conduct of the appellants, and being unable to discover any definite legal theory upon which to grant equitable relief to a corporation where its fiduciaries have secretly purchased control, the preliminary injunction must be dissolved. If the appellee seeks to advocate some new corporate cause of action, it must await a disposition on the merits. There being no clear present right, however, the appellee is not entitled to the issuance of a preliminary injunction to forestall the pending shift of control.

The order granting the preliminary injunction is reversed.