PJ ACQUISITION CORP., directly on its own behalf and derivatively on behalf of Vikings II, Inc., Appellant,

v.

John C. SKOGLUND, individually and as Voting Trustee, et al., Respondents,

Jaye Dyer, et al., Respondents.

No. C3–88–1368.

Supreme Court of Minnesota.

March 9, 1990.

**2**

Jerome B. Simon, Geoffrey P. Jarpe, Maun, Green, Hayes, Simon, Johanneson and Brehl, St. Paul, for appellant.

John D. French, James Fitzmaurice, Faegre & Benson, Minneapolis, for John C. Skoglund, et al.

Curtis D. Forslund, Richard N. Flint, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, for Jaye Dyer, et al.

KELLEY, Justice.

The dispute in this case constitutes but one episode in the ongoing contest between competing factions of the present shareholders, directors and officers for control of Vikings II, Inc., the owner of a National Football League (NFL) franchise authorizing it to field the Minnesota Vikings professional football team.[1] On one side of the conflict is appellant PJ Acquisition Corporation (PJ), owned by Irwin Jacobs and Carl Pohlad, who, by a 1986 purchase, acquired one-third of the corporate voting shares, which had been originally owned by

---

**1.** At the outset, we observe that from the inception of this extended litigation, both parties, from time to time and in varying degrees, have repeatedly hurled vituperative accusations and counter accusations permeated with rancor and punctuated with innuendo, reflecting on the character, morals, motives and abilities of the opposing parties. We consider such vitriolic accusations to be of slight utility in aiding us to resolve the issues raised. None of the contestants in this power struggle for control of Vikings II can claim to be inexperienced innocents in the intricacies surrounding the acquisition and control of business entities.

Max Winter. Its adversaries, the respondents, are certain current corporate officers and directors of Vikings II.[2]

The controversy ultimately arrives in this court as the consequence of the filing in the district court of an amended complaint by PJ in October 1987 charging respondent officers and directors with various acts of misconduct.[3] Though the amended complaint is lengthy, containing 45 pages plus supporting exhibits, the issues raised by the allegations therein relate to four broad issues: (1) claimed abuse of corporate control and breach of fiduciary duty by Lynn; (2) claimed abuse of corporate control by the officers and directors relative to claimed rights of first refusal to purchase corporate stock and appropriation to themselves of an alleged corporate opportunity; (3) claimed abuse of corporate control in connection with the Lynn employment con-

tract; and (4) claimed abuse of corporate control in the payment of excessive compensation and use of corporate assets for noncorporate purposes. Many, but by no means all, of the specific allegations made in support of these broader issues relate to events that occurred before July 21, 1986, when the purchase by appellant from Winter was closed.

The respondents moved to dismiss: (1) all asserted claims relating to Lynn's employment contract occurring prior to July 21, 1986; (2) asserted claims alleging misuse of corporate assets by respondents occurring before that date; (3) all claims alleging violation of fiduciary duty by the directors relating to the transfer of Boyer stock;[4] and (4) all claims made by appellant asserting the corporation's alleged right of first refusal pursuant to March 1984 and December 1985 agreements.[5]

2. Those officers are: John C. Skoglund (Skoglund), Chairman of the Board of Directors; John Steele II (Steele), Senior Vice President; Sheldon Kaplan (Kaplan), Secretary–Treasurer; Michael E. Lynn, III (Lynn), Executive Vice President; Wheelock Whitney (Whitney), President; and Jaye Dyer (Dyer), Vice President.

3. In this action the original summons and complaint was served in September 1986. Further proceedings in the instant case were stayed in November 1986 pending the outcome of *Winter et al. v. Skoglund et al.* then on appeal to this court. *Winter v. Skoglund*, 404 N.W.2d 786 (Minn.1987) became final on May 27, 1987, after a petition for rehearing had been denied. The Hennepin County trial court then dismissed claims alleging improper payment to attorneys Kaplan and O'Connor. Subsequently, appellant's motion to file an amended complaint was granted.

4. A brief review of the history of the relative holdings of Vikings II voting Class B stock up to the time of the sale of the Winter family interest to appellant, set forth in detail in *Winter v. Skoglund*, 404 N.W.2d 786, 787–88 (Minn.1987), is helpful to an understanding of this allegation. In December 1985, after the commencement of *Winter v. Skoglund*, Skoglund and the Boyer Trust entered into an agreement not to transfer corporate stock owned by them without prior approval of the other. That agreement acknowledged the 1977 and 1984 right of first refusal "agreements" (subsequently invalidated in *Winter v. Skoglund*). It did, however, permit intrafamily transfers without prior approval of remaining stockholders. In August 1986, while the outcome of *Winter v. Skoglund* was pending, a Boyer Daughters Trust was established for the

purpose of acquiring from the Boyer Trust the Boyer Class B voting stock in Vikings II. John Steele, Phillip Maas, the husband of Judith Boyer; and Michael Lynn became trustees of the Boyer Daughters Trust. Simultaneously, the trustees of the Boyer Daughters Trust entered into a voting trust agreement with Skoglund. Also executed at that time were two financing agreements to provide the Boyer Daughters Trust with money to purchase the original Boyer stock from the Boyer Trust. On May 22, 1987, after the decision in *Winter v. Skoglund* became final, BWDL Associates (BWDL), a partnership, was formed. The partners, in addition to the three trustees of the Boyer Daughters Trust, are Wheelock Whitney, Jaye Dyer and Lynn. Concurrently, BWDL entered into an agreement to purchase from the Boyer Daughters Trust 200 Class B voting shares and 117.5 Class A nonvoting shares of Vikings II originally owned by Boyer. The purchase transaction between the Boyer Daughters' Trust and BWDL has not been closed.

5. The March 1984 agreement was basic to the issue in *Winter v. Skoglund*. The relevant part of the "agreement," as well as the history surrounding it, is outlined and discussed in *Winter v. Skoglund*, 404 N.W.2d at 789. This court ultimately held the "right of first refusal" contained in that agreement was not binding because not executed by all the parties thereto—in particular the Boyer Trust. *Id.* at 791. The December 1985 agreement referred to in the text, of course, was the agreement between Skoglund and the E. William Boyer Trustees, First National Bank of Minneapolis, Dorothy Boyer and Norman Newhall.

In granting the respondents' partial summary judgment motion, the trial court dismissed with prejudice: all claims asserted by appellant arising from the Mike Lynn employment and compensation agreements which had been executed or extended before July 21, 1986; all claims arising out of the alleged misuse of corporate assets by respondent directors, Skoglund, Steele, Kaplan, and Lynn occurring before that date; all claims arising out of claimed breach of any fiduciary duties allegedly owed by respondents to the corporation pertaining to the several transfers of the Boyer stock; all claims arising out of the alleged rights of first refusal under the March 1984 and December 1985 agreements; and all claims against the Kaplan law firm.[6]

In this opinion, which for convenience we denominate the lead opinion, a majority of the court affirms the trial court's dismissal of all of appellant's claims arising from the Mike Lynn employment and compensation agreements which had been executed or extended before July 21, 1986 and its dismissal of all claims arising out of alleged misuse of corporate assets by respondent directors, Skoglund, Steele, Kaplan and Lynn, which occurred before that date. In the accompanying opinion authored by Justice Yetka, which, also for convenience, we designate as the dissenting opinion, a majority of the court reverses the trial court's dismissal of claims alleging violation of fiduciary duty by the directors relating to the transfer of Boyer stock and claims asserting the corporation's alleged right of

first refusal pursuant to November 1984 and December 1985 agreements. We remand those issues to be tried together with issues not addressed by the trial court's partial summary judgment.

### I. Claims Arising From Pre–July 21, 1986 Events

■ In dismissing the claims of appellant which alleged that certain respondents had, before July 21, 1986, paid themselves excessive compensation, that respondents Skoglund, Lynn, Steele and Kaplan had dissipated corporate assets, and claims arising from Lynn's 1984 employment contract, the trial court ruled that PJ lacked standing to assert those claims.

Neither in its amended complaint, in its brief, nor in oral argument did appellant identify any direct injury to it as a *shareholder* in Vikings II as the result of any alleged acts of misconduct on the part of respondents. The prayer for relief in the amended complaint in paragraphs (e), (f), (g), and (h), itself, seemingly acknowledges that any claims for improper diversion of assets belong to the corporation.[7] Since the allegations of the amended complaint addressing those issues fail to allege any direct injury to appellant, as shareholders, but rather only to Vikings II, the corporation, itself, and because appellant seeks relief in favor of Vikings II rather than itself, the trial court concluded the action in reality was a shareholder's derivative action, and, accordingly, was subject to the procedural requirements of Minn.R.Civ.P. 23.06 governing such actions.[8] That rule

---

**6.** Although appellants' notice of appeal purports to challenge all trial court rulings contained in the order granting partial summary judgment, it neither briefed nor argued the propriety of the court's dismissal of claims against the Kaplan law firm. Therefore, any challenge to that ruling must be deemed waived. *Pautz v. American Ins. Co.,* 268 Minn. 241, 251–52, 128 N.W.2d 731, 738 (1964).

**7.** Paragraph (e) requests that Lynn be enjoined from enforcing the unanimous approval or unanimous action of the Trustees of the August 4, 1986 Voting Trust Agreement. Paragraph (f) seeks declaration that Lynn's employment contract is void and that he is obligated to reimburse Viking II for all excess compensation. Paragraph (g) requests a full accounting from

the directors for all excess compensation. Paragraph (h) requests that Vikings II be reimbursed by Steele, Skoglund, Kaplan and Lynn for all payments to them that were "wrongful, unfair, excessive, wasteful or unreasonable."

**8.** Rule 23.06 in material part provides:

> 23.06 **Derivative action by shareholders or members.** In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a *shareholder* or member at the *time of the transaction of which the plaintiff complains or*

precludes the maintenance of a shareholder's derivative action unless the plaintiff alleges it was a shareholder at the time the acts occurred of which it complains and has made a demand on the board. The parties concede PJ became a shareholder on July 21, 1986. Thus, the complaint did not, nor could it, contain an allegation that PJ was a shareholder at the time when the acts alleged to have resulted in diversion and dissipation of corporate assets occurred prior to that date. Hence, if Rule 23.06 is applicable, the trial court correctly held that appellant lacked standing to assert claims for alleged wrongful acts that occurred before it became a shareholder.

Either by statute or court rule, virtually every state requires "contemporaneous ownership" and "demand on board" as preconditions to maintenance of a shareholder's derivative suit.[9]

Our first inquiry, then, is whether the trial court erred in concluding that the appellant's amended complaint, notwithstanding its allegation of claims under various subsections of Minn.Stat. ch. 302A, sought relief only for Vikings II, and, therefore, was a derivative shareholder's action. Resolution of the issue involves an analysis of the complaint by consideration of the shareholder's claimed injury in conjunction with the remedies requested. When we apply that analysis, we conclude that the trial court correctly determined that those claims were derivative and, therefore, appellant had no standing to bring suit on those claims which occurred prior to July 21, 1986, when it became a shareholder. *See, e.g., Miller v. Miller,* 301 Minn. 207, 219–220, 222 N.W.2d 71, 77–78 (1974); *Westgore v. Grimm,* 318 N.W.2d 56, 58 (Minn.1982); *Seitz v. Michel,* 148 Minn. 80, 87, 181 N.W. 102, 105 (1921).[10] Appellant seeks to avoid that consequence by asserting that certain provisions in Minn.Stat. ch. 302A permit it to maintain these claims as a direct action for equitable relief even though the acts of the respondent officers and directors of which it complains occurred before appellant became a shareholder. Because its amended complaint alleges violations of Minn.Stat. § 302A.255 and .751 (1988) (provisions generally codifying duties and proscribing certain conduct by officers and directors), it argues that the court may grant equitable relief to it in a direct action under Minn.Stat. § 302A.751 even though, admittedly, it was not a shareholder at the time the alleged acts resulting in corporate waste took place or the alleged breaches of director and officer fiduciary duties occurred.[11]

that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the desired action from the directors or comparable auithority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.
(Emphasis supplied).

9. The Model Business Corp. Act (MBCA), § 7.40 contains these preconditions. Thirty-six jurisdictions have statutes setting forth procedures for derivative suits generally modeled after MBCA § 7.40, although two provide limited exceptions. 2 *Model Business Corporation Act Annotated* § 7.4, p. 725 (3d ed. 1989 Supp.). Thirteen of the other 14 jurisdictions, including Minnesota, while having no similar statutory provision, have comparable requirements in rules of civil procedure dealing with shareholder's suits.

10. *Diedrick v. Helm,* 217 Minn. 483, 14 N.W.2d 913 (1944), a case cited by appellant, does recite the rule that officers and directors are subject to a fiduciary duty. However, that court clearly demonstrates that the fiduciary duty runs to the corporation itself. *Id.,* 217 Minn. at 493, 14 N.W.2d at 919.

11. Those portions of Minn.Stat. § 302A.751 relevant to the issue here reads:

Subdivision 1. **When Permitted.** A court may grant any equitable relief it deems just and reasonable in the circumstances or may dissolve a corporation and liquidate its assets and business:

\* \* \* \* \* \*

(b) In an action by a shareholder when it is established that:

\* \* \* \* \* \*

(2) The directors or those in control of the corporation have acted fraudulently, illegally, or in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders, directors, or officers, or as employees of a closely held corporation;

\* \* \* \* \* \*

(4) The corporate assets are being misapplied or wasted; \* \* \*

In support of its argument, appellant cites a portion of a law review article entitled *A Statutory Elixir for the Oppression Malady*, 36 Mercer L.Rev. 627 (1985) authored by Professor Joseph E. Olson who was draftsman of some of the 1983 amendments to Minnesota's Business Corporation Act. In that article Professor Olson states "An action under section 751 is an individual action by the *shareholder* to gain relief in his own right, it is not a derivative right." *Id.* 635–36. (Emphasis supplied). In our view appellant's attempt to stretch that statement, which, in context, seemed to relate to a shareholder's oppression suit, to cover a true derivative action where the relief sought is on behalf of the corporation itself as well as other shareholders, is inapt. While Minn.Stat. § 302A.751, subd. 1 (1988) does expand the options of shareholders to bring actions seeking personal damages, as distinguished from derivative damages, the equitable remedy expanded does not replace the traditional derivative action. For example, in *Masinter v. WEBCO Co.*, 164 W.Va. 241, 255, 262 S.E.2d 433, 442 (1980), the case Professor Olson cites as authority for the quote from his article, the West Virginia Court of Appeals clearly delineated the distinction between an equitable oppressive suit under a similar statute and a shareholder's derivative suit, and, in doing so, reaffirmed its rule that courts should utilize the traditional analysis to determine whether the suit is derivative. Additionally, we observe that nowhere in Minn.Stat. ch. 302A nor in Professor Olson's law review article does one find any intimation that a shareholder, who acquires shares *after* the commission of the acts alleged to have resulted in improper diversion of corporate assets, may maintain a direct equitable action in its own name when seeking relief similar to that sought by appel-

lant in this case. Nor is that surprising. It has long been the law that a shareholder who purchases stock in a corporation is prevented from maintaining a derivative suit if the alleged wrongs forming the basis of the suit occurred before the shareholder's acquisition of its stock. *See, e.g., Bateson v. Magna Oil Corp.*, 414 F.2d 128, 130 (5th Cir.1969), *cert. denied sub nom Magna Oil Corp. v. Bateson*, 397 U.S. 911, 90 S.Ct. 909, 25 L.Ed.2d 91 (1970). Rule 23.06 likewise makes that clear. No reason is readily ascertainable why in 1983 when it enacted Minn.Stat. ch. 302A, the legislature had any intention to provide personal equitable relief to one, who, at the time of the alleged misfeasance or malfeasance by officers or directors, owned no shares. Indeed, it seems to us, the contrary conclusion—that the plaintiff must have been a shareholder, as defined by Minn.Stat. § 302A.011, subd. 29 (1988), at the time of the alleged wrongs—would be the proper result.[12] Commentators writing on the statute seem to have so assumed. *See, e.g.*, Olson, *A Statutory Elixir for the Oppression Malady*, 36 Mercer L.Rev. 627 (1985); Note, *The Limited Liability of Corporation Directors under Minnesota Statute § 302A.251, subdivision 4 (1987)*, 11 Hamline L.Rev. 371 (1988).

But even if the court considers some of appellant's claims to be of a derivative nature and, therefore, subject to the contemporaneous requirement of Rule 23.06, PJ argues, at least those claims based on Lynn's employment contract and the directors' alleged diversion of corporate funds, although occurring before July 1, 1986, were erroneously dismissed by the trial court because they are continuing wrongs. It relies upon an exception to the general requirement of contemporaneous ownership, which provides, that in some limited circumstances, a shareholder's de-

---

Minn.Stat. § 302A.751, subd. 1(b).

**12.** In this case we need not hold that a shareholder plaintiff alleging actions causing him direct damages under 302A.751, subd. 1, must always have to satisfy the contemporaneous ownership and demand requirements of Rule 23.06. But when proper analysis of the complaint leads to the conclusion that, indeed, the

action is derivative, the Rule 23.06 requirement must be met. We note in passing, however, that it can be reasonably argued that even in an action seeking direct equitable action under the statute, the plaintiff must have been a shareholder, as defined in the statute (Minn.Stat. § 302A.011), at the time of the alleged malfeasance.

rivative suit may be maintained even though the alleged wrong occurred before the claimant's stock acquisition provided the alleged wrongful conduct "spans the plaintiffs ownership, or if new elements in a pattern of wrongful conduct occur after acquisition." *Bateson*, 414 F.2d at 130. However, the cases make clear that the mere fact that some of the effects of the alleged acts of wrongdoing continue beyond the time of occurrence is insufficient to trigger the application of the exception. For example, in a case factually strikingly similar to the instant case, *Schreiber v. Bryan*, 396 A.2d 512 (Del.Ch.1978), the plaintiff attempted to come within the exception by alleging that certain amendments had been made to a managerial contract, which originally had been entered into before plaintiff acquired his shares, after the plaintiff had purchased his stock. In rejecting that attempt, the Delaware court held that the amendment, which reconfirmed the earlier agreement, was insufficient to convert the original consummated transaction into a continuing wrong. *Id.* at 517. As was true in *Schreiber*, in this case all of the terms of Lynn's employment contract and all of the facts surrounding the alleged diversion of corporate assets were known by appellant before it acquired the Winter shares; therefore, they do not fall within the continuing wrong exception. Admittedly, the resulting contracts, then in existence, may presently have unexpired terms, but, as noted by the Delaware court, even though in one sense the results of the alleged wrongful conduct may be said to constitute "a continuing wrong to the corporation until remedied," that residual impact is insufficient to afford standing to maintain a derivative action to one who acquired corporate shares after the alleged wrongful conduct under the "continuing wrong exception."

*Id.* at 517. In the instant case, the alleged misconduct of respondents took place long before PJ became a shareholder, and the claimed misconduct was known to it before it "closed" the transaction purchasing the Winter shares.[13] In those circumstances, application of the analysis employed by the Delaware court in *Schreiber*, and by the trial court in the instant case, in our opinion, best serves the underlying rationale of the law regulating the maintenance of shareholder derivative actions—the prevention of purchase of corporate shares for litigious motives. *Schreiber*, 396 A.2d at 516. For that reason, we affirm the trial court's conclusion that these facts do not bring appellant's claims within the "continuing wrong exception," and, accordingly, likewise affirm its holding that PJ lacked standing to assert claims based upon events which transpired prior to July 21, 1986.

## II. Claims Arising From Post–July 21, 1986 Events

As indicated, the majority who joined a portion of the designated dissenting opinion of Justice Yetka would reverse the trial court's dismissal of claims that respondent officers and directors breached fiduciary duties owed by them to PJ and Vikings II in connection with various actions taken to transfer the original Boyer Trust to the Boyer's Daughter Trust and, ultimately, to the BWDL partnership. For reasons set forth hereinafter, I respectfully dissent from that majority position, and would likewise affirm the trial court's entry of partial summary judgment disposing of those claims.

As I understand it, the premise underlying the majority's position is that acquisition of the Boyer shares was a corporate opportunity which the respondents as officers and directors of Vikings II had

---

13. Prior to closing the sale with Winter, PJ had been furnished audited income and balance sheets of the company pursuant to paragraph 3.08 of the Stock Purchase Agreement between them. Moreover, paragraph 3.12 of that Agreement acknowledges the existence of the "Employment Agreement dated January 1, 1978, amended September 1, 1981, and further amended on April 7, 1984 between Vikings I and Michael E. Lynn III and the Agreement dated December 7, 1979, as amended on April 7, 1984 between the same parties * * *." Furthermore, the minutes of the Board of Directors of Vikings II dated April 7, 1974, executed by authorized persons to represent the owners of all the shares of Vikings II, including Max Winter, show precisely the terms of Lynn's employment contract (Exhibit F to the Jarpe deposition).

usurped and appropriated to their own profit. Because the trial court ruled as a matter of law the acquisition was not a corporate opportunity, the majority would remand for trial of that issue. No one would quarrel with the general proposition that ordinarily whether an acquisition is a corporate opportunity is a question of fact, but, when, as here, the undisputed facts, in my opinion, demonstrate that the acquisition of those shares was as a matter of law not a corporate opportunity, summary judgment on this issue was appropriate.

PJ's corporate opportunity claim is bottomed on its contention that Vikings II had an established pre-existing policy or practice relative to the acquisition of its own stock, or at least that a factual issue exists as to whether it did have.

We first enunciated a definition of "corporate opportunity" in 1944 when we opined:

> Where a business opportunity is in the line of the corporation's activities, especially if intended for it, the opportunity, as one in which it has a legitimate interest or expectancy, belongs to the corporation and not to its officers or directors, * * * but, where the opportunity is one in which the corporation has no interest or expectancy, the opportunity is not a corporate, but a personal, one, and belongs to the director with the right to treat it as his own.

*Diedrick v. Helm,* 217 Minn. 483, 494, 14 N.W.2d 913, 919 (1944).

We likewise also characterized transactions which were extraneous to the corporation's business as not being corporate opportunities. *Diedrick,* 217 Minn. at 495, 14 N.W.2d at 920. Later, we held that a business opportunity is personal when the corporation, either because of financial, legal or other disability or restriction, is unable to avail itself of the opportunity. *Hart v. Bell,* 222 Minn. 69, 82, 23 N.W.2d 375, 382 (1946). In *Miller v. Miller,* 301 Minn. 207, 224, 222 N.W.2d 71, 81 (Minn. 1974), we promulgated a two-part test for use in evaluating whether an officer or director has usurped a corporate opportunity to his or her own use. First, the court must determine if the business opportunity is a corporate opportunity. If it is not, that ends the inquiry. In resolving that issue, which ordinarily is a question of fact, the court must examine many facts and circumstances relevant to the opportunity.[14] However, when the facts are undisputed and show that the opportunity "bears no logical or reasonable relation to the existing or prospective business activities of the *corporation*" (emphasis supplied) the opportunity is noncorporate as a matter of law. *Miller,* 301 Minn. at 225, 222 N.W.2d at 81.

Absent special circumstances, the opportunity to purchase the corporation's own outstanding stock is not corporate, "Thus, generally speaking, a corporation has no interest in its outstanding stock or in the dealings of its officers, directors or shareholders with respect thereto, and unless there should exist some reason or necessity for the corporation to purchase its outstanding shares those in a fiduciary relationship to the corporation do not usurp a corporate opportunity by purchasing the corporate shares * * *." 3 *Fletcher Cyclopedia of the Law of Private Corporations* § 862, p. 303 (perm rev. ed. 1986). We, too, have followed that general rule. *Rogers v. Drewry,* 196 Minn. 16, 20, 264 N.W. 225, 227 (1935); *Dutton v. Barnes,*

---

**14.** The significant facts include:

Whether the business opportunity presented is one in which the complaining corporation has an interest or an expectancy growing out of an existing contractual right; the relationship of the opportunity to the corporation's business purposes and current activities—whether essential, necessary, or merely desirable to its reasonable needs and aspirations—; whether, within or without its corporate powers, the opportunity embraces areas adaptable to its business and into which the corporation might easily, naturally, or logically expand; the competitive nature of the opportunity—whether prospectively harmful or unfair—; whether the corporation, by reason of insolvency or lack of resources, has the financial ability to acquire the opportunity; and whether the opportunity includes activities as to which the corporation has fundamental knowledge, practical experience, facilities, equipment, personnel, and the ability to pursue.

*Miller,* 301 Minn. at 225, 222 N.W.2d at 81.

162 Minn. 430, 432, 203 N.W. 414, 415 (1925); *Seitz v. Frey,* 152 Minn. 170, 174, 188 N.W. 266, 268 (1922).[15]

Appellant, however, claims that general rule is inapplicable when the corporation historically has followed a policy or practice of acquiring its own shares when available. Vikings II, it asserts, has established such a practice, or at least whether it has, is a fact issue.[16] The first evidence supporting the policy, it claims, is the fact that following the death of Olaf Haugsrud, one of the original owners of shares in Vikings I, and the forced divestiture of the shares owned by Northwest Publications, Inc., another original owner of shares in Viking I, both in 1977, Vikings II was formed to acquire their Viking I shares. Secondly, it claims that the actions of Skoglund and the Boyer trustees relative to the sale of the Winter shares to PJ and the position taken by them in the subsequent litigation arising from that sale support PJ's present assertion of existence of a practice and policy of the corporation to acquire its own shares.

Respondents counter with the arguments (1) that our cases as well as those from other jurisdictions clearly establish that in the context of acquisition of its own available shares, the opportunity is corporate only, if from the standpoint of the corporation itself, it needs the stock or has a clear reason for pursuing its acquisition, *see, e.g.* note 15 herein; (2) the formation of Vikings II to acquire the Haugsrud and Northwest Publications, Inc. stock was not for corporate purposes but rather to preserve relative positions of ownership with

respect to surviving stockholders; and (3) rather than supporting appellant's claim, the facts surrounding the acquisition by appellant of the Winter shares clearly and unequivocally negate any contention in this case that Vikings II needed its own stock, had a special interest in it, or had a corporate practice or policy of redeeming its shares. They stress that Winter, the president, a major shareholder, director, and one of the original founders of the corporation, who presumably would have known about the existence of such a policy if, in fact, one existed, not only did not offer his shares to the corporation, but engaged in hotly contested litigation to prevent Vikings II from purchasing his stock. Moreover, respondents emphasize in *Winter v. Skoglund* the directors, officers and shareholders of Vikings II, in resisting Winter's sale to PJ and in attempting to acquire Winter's stock for themselves, did not rely on any alleged practice or policy of the corporation to acquire its own shares, but rather based their entire claim on the asserted validity of the December 1977 and March 1984 inter se shareholder "agreements."

It seems clear to me, as it did to the trial court, that the understanding of all the shareholders, directors, and officers, as manifested by positions taken by each in *Winter v. Skoglund,* is fatal to PJ's present contention that Vikings II had a custom and practice of redeeming its own shares. In the course of the *Winter* litigation, none of its founders, its officers, nor principal shareholders saw or articulated

**15.** Cases from other jurisdictions likewise hold that an opportunity to acquire available corporate stock is not corporate unless it is demonstrated that the corporation needs to acquire the stock or has a clear stated existing interest in and reason for its acquisition. *See, e.g., Vulcanized Rubber & Plastics Co. v. Scheckter,* 400 Pa. 405, 414, 162 A.2d 400, 406 (1960) (officer's or shareholder's individual expression of opinion insufficient to make a corporate opportunity); *Katz Corp. v. T.H. Canty & Co.,* 168 Conn. 201, 209–10, 362 A.2d 975, 979–80 (1975) (allegations that officers and directors bought corporate shares at bargain price insufficient to establish usurpation of corporate opportunity); *Tovrea Land & Cattle Co. v. Linsenmeyer,* 100 Ariz. 107, 122–23, 412 P.2d 47, 57–58 (1966) (corporation president borrowed money from corporation to

purchase corporate shares); *Zidell v. Zidell, Inc.,* 277 Or. 423, 429, 560 P.2d 1091, 1095 (1977) (shareholders bought corporate shares at bargain price and allegation purchase should have been for the benefit of all shareholders; held, plaintiff failed to establish that corporate opportunity had been usurped).

**16.** Neither party has disputed the fact that no evidence in the record supports a claim that there was a past practice of the *corporation* acquiring its own shares. To the contrary, a new corporation was formed to acquire the shares of Haugsrud and Northwest Publications precisely so the shareholders would maintain their relative same position vis-a-vis each other.

any corporate reasons for Vikings II to purchase any of Winter's shares. That recent history of the actions and understanding of all of the officers, directors and shareholders of Vikings II differentiates this case from such as *Faraclas v. City Vending Co.*, 232 Md. 457, 464, 194 A.2d 298, 300–01 (1963) (by-law established the corporation would redeem its own stock, and all officers, directors and shareholders had agreed the asset would be acquired for the corporation); *Sladen v. Rowse*, 115 R.I. 440, 444–45, 347 A.2d 409, 413 (1975) (stock purchase agreement existed and opportunity of corporation to redeem had been discussed at board meeting); *Kelly v. 74 & 76 West Tremont Ave. Corp.*, 4 Misc.2d 533, 151 N.Y.S.2d 900, 903 (Sup.Ct.1956), *aff'd sub nom Procario v. 74 & 76 West Tremont Ave. Corp.*, 3 N.Y.2d 973, 146 N.E.2d 795, 169 N.Y.S.2d 39 (1957) (corporation officer who had been negotiating purchase of corporate shares on behalf of the company, purchased instead for himself). Rather, the facts relative to the recent history and the position taken by all of the officers, shareholders and directors of Vikings II with respect to the corporation's acquisition of its own stock more closely parallels those existing in cases where courts have rejected a claim of usurpation of corporate opportunity. *See, e.g., Vulcanized Rubber & Plastics Co. v. Scheckter*, 400 Pa. 405, 414–15, 162 A.2d 400, 406 (1960) ("[w]hat is necessary is some affirmative action by the corporate organization which will disclose a corporate purpose, reason and program * * *. [T]his would have required action by the directors acting as a board, and not singularly"); *Northwestern Terra Cotta Corp. v. Wilson*, 74 Ill.App.2d 38, 48, 219 N.E.2d 860, 865 (1966) ("but even this so-called policy was never adopted by the stockholders, Board of Directors or even the Executive Committee"). Courts in Connecticut and Oregon have likewise addressed the issue. In *Katz Corp. v. T.H. Canty & Co.*, 168 Conn. 201, 362 A.2d 975 (1975) notwithstanding the existence of an informal agreement among original directors that the corporation would purchase available outstanding stock, the court held the acquisition of shares was not a corporate opportunity, stating "Ordinarily, a corporation has no interest in its outstanding stock and unless there is some reason or necessity for the corporation to purchase its outstanding stock, an officer or director does not usurp a corporate opportunity by making purchases for his own account." *Katz*, 168 Conn. at 209–10, 362 A.2d at 980. The Oregon court in *Zidell v. Zidell*, 277 Or. 423, 560 P.2d 1091 (1977) further held that a showing that in the past the corporation had redeemed some outstanding stock was inadequate to establish that stock acquisition was a corporate opportunity.

> Plaintiff presented no evidence that the corporations have made a practice of purchasing their own stock or that they ever contemplated doing so in order to maintain proportionate control, and there is no basis for inferring an agreement to that effect. Absent such a corporate policy, there is normally no special corporate interest in the opportunity to purchase its own shares.

*Id.* at 427, 560 P.2d at 1093. The court, in a footnote, found that redemption of a small number of shares by the corporation was not sufficient to justify the inference of a corporate policy to redeem large blocks of corporate stock. *Id.* at 427 n. 5, 560 P.2d at 1093 n. 5. In my view, the facts surrounding the relationship of the parties to this and allied litigation clearly demonstrate the lack of any practice or policy of Vikings II at any time since its inception to establish a policy that the *corporation* itself would routinely acquire its own stock by redemption from stockholders.[17] The historical facts and all reasonable inferences arising therefrom undisputedly demonstrate to me that the opportunity to acquire the Boyer shares presented

---

17. PJ, in another context, supports its position there taken in reliance upon an agreement between Skoglund and the Boyer trust in December 1985 which, in effect gave to each—not the corporation—the right to acquire the other's stock in the event of sale. That agreement would likewise, I submit, militate against its present assertion that a corporate custom or practice existed.

"no logical or reasonable relation to the existing or prospective business activities of the corporation * * *." *Miller,* 301 Minn. at 225, 222 N.W.2d at 81. Therefore, I conclude it is noncorporate as a matter of law.

Moreover, even though an opportunity in certain circumstances, might be considered to be a "corporate opportunity," it ceases to be such when a practical impossibility prevents the corporation from acquiring it. The opportunity then becomes "personal" and the officers or directors may acquire it for their individual benefit. *Hart v. Bell,* 222 Minn. at 82, 23 N.W.2d at 382; *A.C. Petters Co. v. St. Cloud Enterprises,* 301 Minn. 261, 266, 222 N.W.2d 83, 86 (1974); *Miller,* 301 Minn. at 225, 222 N.W.2d at 81; Slaughter, *The Corporate Opportunity Doctrine,* 18 Sw.L.J. 96, 100 (1964).[18]

Thus, even had I not concluded that the acquisition of the Boyer stock was not a "corporate opportunity" as a matter of law because never considered to be so by affected officers, directors or shareholders, additionally I observe that as a practical matter the stock's acquisition was not a "corporate opportunity" because it was unavailable to the corporation.

In October 1985, when Max Winter and his daughters agreed to sell their shares of Vikings II to PJ, all other shareholders—the Skoglunds and the Boyer Trust trustees—claimed a right of first refusal on behalf of the corporation pursuant to the alleged "agreements" of 1977 and 1984. If the corporation acquired the Winter shares, the relative position of the other shareholders would remain the same, to-wit, no family unit holding shares would be relegated to a minority position with respect to any other family group owning shares. The history of Vikings I and II demonstrates that, in particular, Skoglund and the Boyer Trusts had been united in taking actions designed to maintain that relative balance. Shortly after *Winter v. Skoglund* was commenced, on December 6, 1985, Skoglund and the Boyer Trust entered into an agreement in which each agreed not to encumber or alienate Vikings II voting stock without the prior written agreement of the other. While still asserting the validity of the 1977 and 1984 "agreements," by this latest agreement each party was able to "hedge" its relative position if, as, in fact, it ultimately turned out, its position relative to the validity of the 1977 and 1984 "agreements" was not sustained in *Winter v. Skoglund.* Neither Skoglund's assent to the transfer of the shares from the Boyer Trust to the Boyer Daughters Trust in 1966, while *Winter v. Skoglund* was still pending, nor his consent to the further transfer of those shares to BWDL Associates was at variance with the original goal of both the owners of the Skoglund and Boyer shares to maintain a relative stock ownership and control position in Vikings II.

From 1977 until the present, the actions of the owners of the Skoglund and Boyer shares, as well as the provisions in the various "agreements," some invalid and others valid, entered into between them have been consistent with the intent of both to restrict the disposition of each others' shares to strangers by a transfer which would relegate either to a minority position.

Likewise, those past consistent actions corroborate Skoglund's later affidavit that he would not have permitted the Boyer Trustees, or their successors, to sell their voting stock to Vikings II. It seems clear to me that the trial court was justified in holding that even had the Boyer trustees been willing to sell and had Vikings II had some valid business reason to purchase the Boyer voting shares, the shares were not available at any material time to the corporation. Considering the history of discord, charges and countercharges, and resulting animosity, it appears inconceivable to me

---

**18.** *See also Hauben v. Morris,* 255 App.Div. 35, 46, 5 N.Y.S.2d 721, 731 (Sup.Ct.1938) *aff'd,* 281 N.Y. 652, 22 N.E.2d 482 (1939); *Bisbee v. Midland Linseed Product Co.,* 19 F.2d 24, 27 (8th Cir.), *cert. denied,* 275 U.S. 564, 48 S.Ct. 121, 72 L.Ed. 428 (1927); *Urban J. Alexander Co. v.* *Trinkle,* 311 Ky. 635, 640–41, 224 S.W.2d 923, 926 (1949); *Pioneer Oil & Gas Co. v. Anderson,* 168 Miss. 334, 345, 151 So. 161, 163 (1933); *Washer v. Seager,* 272 App.Div. 297, 303–04, 71 N.Y.S.2d 46, 52–53 (Sup.Ct.1947), *aff'd,* 297 N.Y. 918, 79 N.E.2d 745 (1948).

that any other logical conclusion could ensue. From Skoglund's point of view, the prospect of a deadlocked board with his rival presented a prospect latent with tragic consequences to his interests in the corporation. There is no evidence, nor facts from which logical inferences may be deduced, that during the relevant period the Boyer shares would have been available to Vikings II. If they were unavailable, there was, of course, no corporate opportunity. *Diedrick* 217 Minn. at 495, 14 N.W.2d at 920.

The trial court ruled that appellant was collaterally estopped by our ruling in *Winter v. Skoglund*, 404 N.W.2d 786 (Minn. 1987) to now contend that the March 1984 "agreement" gives Vikings II a right of first refusal in any contemplated sale of Vikings II voting shares. The appellant here contends that *Winter v. Skoglund* did not address the claim of a corporate right of first refusal, and that, therefore, its claims are not barred by collateral estoppel.

In *Ellis v. Minneapolis Comm'n on Civil Rights*, 319 N.W.2d 702 (Minn.1982), we set out the elements of collateral estoppel: first, the present issue must be identical to that in the prior litigation; second, a final judgment in the prior litigation must have been entered; third, the party to be estopped must have been a party or in privity with a party to the prior ligation; finally, the estopped party must have been afforded a fair and full opportunity to be heard on the issue. *Id.* at 704, citing *Victory Highway Village, Inc. v. Weaver*, 480 F.Supp. 71, 74 (D.Minn.1979). As a party in *Winter v. Skoglund*, appellant was given a full and fair opportunity to be heard— and, indeed prevailed. Here, appellant would limit the holding in *Winter* to ruling only that Winter was not bound by the 1984 "agreement," so the issue with respect to the owners of the Boyer's shares remained undecided. Appellant's interpretation of our holding in *Winter* is too restrictive. That decision was predicated on a finding that no contract had been formed because of the absence of the mutual assent necessary to formation of a contract. Specifically we affirmed the trial court's

findings that the parties to the purported 1984 "agreement" intended that all or none of the voting shares of Vikings II be subject to a right to first refusal, and, as well, that John Steele's signature on the "agreement" did not bind the Boyer Trust. *Winter*, 404 N.W.2d at 791. Moreover, we held the purpose of the "agreement" could not be achieved unless all the holders of the voting shares were bound. Finally, we held that the approval of the Boyer trustees was a condition precedent to the formation of any contract, but because their subsequent acceptance came too late, the issues of ratification or "relation back" were irrelevant concepts. *Id.* at 791. Thus, in *Winter v. Skoglund*, clearly we found the 1984 "agreement" to be unenforceable against all parties, including Winter who had signed it. Insofar as appellant's present claim is based on the 1984 "agreement," it is precluded by the doctrine of collateral estoppel.

Because the December 1985 agreement only created rights and duties between Skoglund and the Boyer trust in the event, as happened, that the 1984 "agreement" should be found by the courts to be unenforceable, as discussed above, I would likewise reject appellant's claim that, as a nonparty to that agreement, it can now contend that the agreement created rights in the corporation to redeem its own shares. If the 1984 "agreement was a nullity," it created no rights in any person.

For these reasons, I would affirm the partial summary judgment entered by the trial court which also disposed of these issues and would remand only for trial of undecided issues.

## Conclusion

As the result of the split vote of the court on the various issues, it is ordered:

1. The trial court's partial summary judgment is affirmed as to the claims of excessive compensation, dissipation of corporate assets, and the Lynn employment contract which arose before July 21, 1986 when PJ acquired the winter stock.

2. The trial court's partial summary judgment concerning claims relating to the transfer of the Boyer shares and alleged violation of fiduciary duties to acquire them as a corporate opportunity, all of which occurred after July 21, 1986, is reversed.

3. The case is remanded to the trial court for the trial of those issues together with issues still pending before the trial court.

YETKA, Justice (dissenting).

I respectfully dissent. I do so because I believe that the lead opinion is fundamentally anchored in *Miller v. Miller*, 301 Minn. 207, 222 N.W.2d 71 (1974), which was decided before significant legislative changes to the Minnesota Business Corporation Act. The opinion fails to recognize that, in 1981 and 1983, the legislature totally overhauled corporation law in Minnesota with the intent and effect of precluding actions of the sort undertaken in this case by the respondents. While the law previously may have allowed the business community much latitude in dealings among its members, the current statutes reflect an attempt to change that practice. Instead of continuing to allow the "sea of sharks" to prey on one another, our legislature has imposed on business practices in this state a higher standard of civility and ethics. Specifically, I cannot be a party to a majority opinion which condones or permits the type of activity exhibited in these proceedings. I believe our law was intended to prevent such predatory and self-serving behavior by officers of a corporation and designed to protect the shareholders who hire officers to serve the best interests of the corporation.

In 1979, when The Advisory Task Force on Minnesota Corporation Law undertook the task of developing a proposal to revise and modernize our state's business corporation law, it envisioned the fundamental functions of that law to be "substantial flexibility and informality in matters of procedure, together with substantial disclosure of and accountability for the corporate actions resulting from those procedures."

Advisory Task Force on Minnesota Corporation Law, Report to the Senate of the State of Minnesota of 1981 at 14 (1980) (reprinted in Minnesota Statutes Annotated (West 1985 Special Pamphlet)). By affirming the trial court's partial summary judgment in this case, thereby allowing the respondents to escape accountability, the majority is violating the spirit and intent of the Minnesota Business Corporation Act. I would find that PJ Acquisition does have standing to bring claims arising out of the Mike Lynn employment contract and has set forth sufficient issues of material fact to avoid summary judgment on its claims relating to the Boyer stock transfers and right-of-first-refusal agreements.

I.

The trial court found that appellant lacked standing to pursue claims arising out of the 1984 Lynn employment contract and the alleged misuse of corporate assets by certain respondents prior to July 21, 1986. The majority reaches the same conclusion by recognizing that the relief requested by appellant is in favor of the corporation, Vikings II, and concluding, therefore, that the action is derivative and must comply with the requirements of Minn.R.Civ.P. 23.06, *i.e.*, "contemporaneous ownership" and "demand on board."

It should first be noted that appellant has standing to bring claims arising out of the Mike Lynn employment contract even as a derivative action under Rule 23.06. Appellant alleges that, at a Board of Directors' meeting on September 2, 1987, the directors voted to affirm Lynn's employment contract prospectively and that the vote was taken in bad faith, fraudulent, illegal and unfairly prejudicial to Vikings II shareholders. The amended complaint also alleges the futility of further demand on the Board of Directors to remedy this course of action. Appellant was a shareholder when the Lynn contract was affirmed and should be able to bring a regular derivative action for injury to the corporation after that date.

More importantly, appellant states a cause of action for breaches of the appro-

priate standards of conduct by respondent directors and officers based on the provisions of Minn.Stat. ch. 302A. I would hold that, despite the derivative nature of the relief appellant requests, most of its claims fall under chapter 302A and should be allowed to proceed to trial.

Minn.Stat. § 302A.467 provides:

If a corporation or an officer or director of the corporation violates a provision of this chapter, a court in this state may, in an action brought by a shareholder of the corporation, grant any equitable relief it deems just and reasonable in the circumstances and award expenses, including attorneys' fees and disbursements, to the shareholder.

Minn.Stat. § 302A.467 (1988). The reporter's notes to section 302A.467 state: "This section gives the courts wide discretion in determining the relief to be granted and the situations in which relief should be ordered." Minn.Stat.Ann. § 302A.467 (West 1985) (Reporter's Notes).

Courts and commentators have recognized that, in certain cases involving closely held corporations, the reasons for distinguishing between derivative and direct actions do not exist and, therefore, actions which could otherwise be characterized as derivative should be treated as an individual action. *See Watson v. Button*, 235 F.2d 235, 237 (9th Cir.1956); § 7.01(d) of *ALI Principles of Corporate Governance: Analysis and Recommendations* (Tent. Draft No. 8, Apr. 15, 1988). The basic purpose of Rule 23.06 is to prevent "strike suits," that is, a suit brought by a plaintiff who purchased a nominal interest in a corporation in order to bring a lawsuit. *See Schreiber v. Bryan*, 396 A.2d 512, 516 (Del. Ch.1978). Although strike suits are a legitimate concern in cases such as *Schreiber*[1] which involve large, publicly traded corporations, the same concerns are invalid in the context of closely held corporations. It is difficult to believe that an investor with litigious motives would intentionally purchase the shares of an oppressed or "frozen out" shareholder in a closely held corporation for which no ready market for resale of the shares exists. A court finding that a plaintiff brought a strike suit may exercise equitable powers under section 302A.751 to deny relief. Thus, the flexible remedy created by the legislature is readily adaptable to meet the concerns which Rule 23.06 was designed to address *if they are present*. Accordingly, I believe that section 302A.751 was intended to supersede Rule 23.06 in cases involving closely held corporations.

Appellant clearly alleges violations of chapter 302A. Section 302A.251 outlines the standard of conduct for directors:

A director shall discharge the duties of the position of director in good faith in a manner the director reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

Minn.Stat. § 302A.251, subd. 1 (1988). The identical standard is applicable to officers of a corporation via Minn.Stat. § 302A.361. The reporter's notes once again are helpful:

Directors have great powers over the corporation, and few restrictions. The most important restriction on their power is the duty to comply with the standard of conduct set forth in this section.

\* \* \* \* \* \*

\* \* \* Majority shareholders may also be required to conduct themselves in certain ways with respect to other shareholders \* \* \*. These standards are not specifically defined in this statute, because the courts must be free to continue to make determinations of the applicable

---

**1.** *Schreiber* involved litigation relating to a contract between the Pennzoil company and its affiliates. Although the lead opinion characterizes *Schreiber* as "factually strikingly similar" to the present case because of issues relating to the amendment of the contract, majority at 7, it ignores the facts that *Schreiber* did not involve a closely held corporation and the details of the allegedly wrongful contract were fully disclosed in a prospectus. *See Schreiber* at 512 & n. 2. Unlike in *Schreiber,* there is *nothing in the record* indicating what appellant knew about the Lynn employment contract that justifies granting summary judgment on claims relating to the Lynn contract. Accordingly, the *Schreiber* analysis simply does not apply.

duty on the basis of the facts in each case.

Minn.Stat.Ann. § 302A.251 (West 1985) (Reporter's Notes).

With the above provisions in mind, appellant can establish a legal basis for its allegations relating to excessive compensation, use of corporate assets for personal purposes and the Lynn employment contract without having to prove that they fall within the continuing wrong exception to derivative claims. Essentially, the trial court erred by applying the Minn.R.Civ.P. 23.06 requirements to breach-of-fiduciary-duty claims brought under chapter 302A.

Admittedly, appellant was not a shareholder when some of the alleged violations unrelated to the Lynn employment contract occurred and lacks standing to assert those claims even under chapter 302A. However, continuing violations of chapter 302A by respondents provide a valid basis for this shareholder complaint even if they do result from wrongful conduct which took place initially before July 21, 1986. The continuing-wrong theory was discussed at length by this court in *Vista Fund v. Garis*, 277 N.W.2d 19, 24–26 (Minn.1979). In *Vista*, we observed that, under the continuing-wrong theory, the contemporaneous ownership requirement of Rule 23.06

> may be satisfied if the wrong is a continuing one, as where the particular wrong spans his ownership of stock or *new elements in a pattern of wrongful conduct occur after acquisition* of his stock and the wrong has not completely occurred and been terminated prior to the stock acquisition.

*Id.* at 25 (quoting 13 W. Fletcher, *Cyclopedia of the Law of Corporations* § 5982 at 426 (rev.perm.ed. 1970)) (emphasis added). The 1983 amendments to chapter 302A manifest a legislative judgment that traditional principles of corporate law designed to address lawsuits faced by large corporations, such as the contemporaneous ownership requirement of Rule 23.06, do not adequately protect minority shareholders in closely held corporations.

In light of the amendments to chapter 302A enacted after this court's decision in *Vista Fund v. Garis*, 277 N.W.2d 19 (Minn. 1979), and given the unique nature of closely held corporations, I would hold that the continuing-wrong exception to Minn.R. Civ.P. 23.06 applies to the claims concerning the Lynn employment contract. The allegations concerning the Lynn employment contract raise genuine issues of material fact as to the validity of the contract. Specifically, there are genuine issues of fact with respect to whether the contract was executed and approved by a majority of disinterested directors or shareholders.

The record in this case consists of the pleadings and affidavits. In its amended complaint, appellant alleges the basis for its continuing-wrong theory of recovery in considerable detail. Appellant alleges that, in March of 1984, Lynn proposed a new contract for himself to Winter. The contract called for greatly increased compensation and a "golden parachute" clause under which he would be paid the same compensation even if he ceased to be employed. The amended complaint alleges that Winter refused to sign the contract on the grounds that "the President of General Motors did not make that much money." The amended complaint further alleges that Lynn fraudulently told Skoglund and Steele that Winter had previously agreed to the terms of the proposed contract in order to obtain their oral agreement to it. The appellant also alleges that Lynn ultimately obtained Skoglund's and Steele's support for the proposed contract terms by preparing a "Unanimous Consent of the Vikings' Directors," which incorporated the proposed terms into Lynn's contract and provided Skoglund and Steele each with a promotion and a $50,000 per year increase in salary. Appellant further alleges that Lynn presented the unanimous consent form to Winter with the others' signatures on it and said, "Sign it or you will be O–U–T, out." After Winter protested, Lynn then handed Winter the Notice of Special Meeting of the Board of Directors of Vikings II, Inc., to be held in 4 days. Later, after receiving assurances that he would remain president for life with no decrease in compensation, Winter signed the unanimous consent. Finally, the complaint specifically

alleges that the contract is void pursuant to Minn.Stat. § 302A.255; that, with respect to the September 2, 1987 affirmance, all the material facts regarding Lynn's contract were not fully disclosed or known to the directors; and that the respondent directors have continued and perpetuated Lynn's wrongful assumption of power and excessive compensation arrangements.

The affidavit of Skoglund offered in support of respondents' motion for summary judgment is silent as to the allegations concerning Lynn's contract. By contrast, the affidavit of Geoffrey P. Jarpe, counsel for appellant, offered in opposition to the motion for summary judgment specifically states that, pursuant to the "Unanimous Consent" of April 1984, Lynn, Skoglund, and Steele all received significant monetary benefits, participated in the decision to benefit themselves, and were three of the five directors to sign the document authorizing the changes to Lynn's contract. The September 2, 1987 vote to affirm the Lynn employment contract is the "new element" which occurred after appellant purchased the stock and makes the alleged wrong a continuing one. A shareholder must be able to pursue claims of wrongful conduct against the controlling shareholders, and chapter 302A ensures this by providing shareholders with a more flexible, equitable route than the pursuit of a derivative action.

I believe that appellant has stated a cause of action under Minn.Stat. § 302A.255 (director conflict of interest) and common law and has presented genuine issues of material fact as to whether the Lynn employment contract was void from the beginning. If the contract was void from the beginning, and, yet, payments were and continue to be made under it, these payments constitute a continuing wrong as each payment constitutes a violation of sections 302A.251 and 302A.361 (director and officer standard of conduct).

Accordingly, I would hold that the trial court improperly granted summary judgment with respect to the claims involving Lynn's employment contract.

Contrary to the majority's position, the mere fact that appellant asks for relief resembling that usually sought in a derivative action does not render its claims derivative. Also, assuming that the majority's analysis of the complaint is accurate and appellant never alleges a direct injury to itself as a shareholder, such an omission does not defeat a claim premised on the provisions of chapter 302A.[2] The ability to bring a claim under this chapter does not depend on the type of injury suffered and whether it is direct or derivative, but, rather, stems from the occurrence of the misconduct by the corporation, officer or director. All that section 302A.467 requires is that a provision of the chapter be violated and the suit be brought by a shareholder. Because courts are allowed to grant any equitable relief they deem just and reasonable, it is perfectly plausible that such relief might mirror the remedies of a derivative action.

There is another factor the trial court should consider. I doubt whether any party would dispute the proposition that, if Winter still owned the stock which he sold to PJ, he would have the right to bring this lawsuit. If that is so, it is illogical to hold that the right to such a lawsuit is lost to his successors. The lead opinion makes much of the argument that the cause of action is derivative. Why should not successors-in-interest to a block of stock have the same rights as their assignor? This is particularly so in a closed corporation where the stock is not broadly held by the public and is a good example of where the legislature, by amending chapter 302A, intended to allow a trial court to be flexible in allowing such a suit.

---

**2.** Appellant does allege a direct injury as a result of Lynn's negotiation and execution of the agreements surrounding the Boyer trust. Its brief to this court states: "Lynn's activities in pursuit of his personal enrichment and extension of personal power had the effect of diminishing the value of the shareholders' (including PJ) investment in the Corporation, and diminishing the ability of PJ as a voting shareholder of the Corporation to exercise influence over its affairs."

## II.

■ The trial court also granted summary judgment on "all claims arising out of the alleged fiduciary duties owed by the defendant directors to the Corporation pertaining to the transfer of the Boyer Voting Stock and certain non-voting stock." The lead opinion classifies this claim as one for usurpation of a corporate opportunity and would affirm the trial court's finding that there was no corporate opportunity as a matter of law. Appellant recognizes the general rule that the opportunity to acquire available corporate stock is not a corporate opportunity, but argues that there is a question of fact as to whether Vikings II has a pre-existing policy or practice of acquiring its own stock. It is important to remember the role of the trial court at this stage of the litigation. Its function on a motion for summary judgment is not to resolve issues of fact, but to determine whether they exist. *Schmidt v. Smith*, 299 Minn. 103, 107, 216 N.W.2d 669, 671 (1974); *Simonson Cashway Co., Inc. v. Merickel Constr. Co., Inc.*, 391 N.W.2d 903, 905 (Minn.App.1986). Additionally, all doubts and factual inferences must be resolved against the moving party, who also bears the burden of showing that there is no genuine issue of material fact. *Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982); *Barilla v. Clapshaw*, 306 Minn. 437, 439, 237 N.W.2d 830, 831 (1976). Whether the past practice of the corporation in acquiring its own stock was done for corporate purposes, as appellant alleges, or merely to preserve the shareholders' relative positions of ownership, as respondents assert, is a question of fact. It is neither the function of this court nor the trial court on a summary judgment motion to evaluate the impact the relationship of the parties has on this issue or determine whether they considered the acquisition of corporate stock a corporate opportunity. These are questions better left to the trier of fact.

Moreover, appellant correctly argues that the trial court erred by assuming that the only breach-of-fiduciary-duty issue raised by the Boyer stock agreements was whether the purchase of the stock was a corporate opportunity. Certainly, that is one basis on which a claim could be sustained, but appellant advances other grounds as well. In particular, appellant alleges that Mike Lynn and the other directors, by supporting his efforts, "promoted and advanced his private, personal interests, instead of and at the expense of the rights and interests of Vikings II and its shareholders." The amended complaint explains the allegations in detail and alleges that:

> In pursuing the transactions of August 4 and 5, 1986, [relating to the Boyer trusts] and May 22, 1987 [formation of BWDL to purchase Boyer stock], Lynn subordinated or disregarded his fiduciary duties of good faith, loyalty, fidelity and fair dealing to Vikings II and its shareholders in favor of his personal and private interests. In so doing, Lynn acted and continues to act in bad faith, contrary to the best interests of Vikings II, without the care that an ordinarily prudent person would exercise under similar circumstances, and in a fraudulent, illegal, and unfairly prejudicial manner toward shareholders of Vikings II. Moreover, said transactions also involved and served the personal and private interests of all of the other defendant directors, leaving no one to act for and protect Vikings II with respect thereto.

■ The thrust of appellant's argument appears to involve the self-serving nature of respondents' involvement in the Boyer stock agreements. While appellant should be allowed to pursue a claim based on the usurpation of a corporate opportunity, Minn.Stat. ch. 302A also provides separate grounds for relief.

In addition to the Minn.Stat. §§ 302A.251 (directors' standard of conduct), 302A.361 (officers' standard of conduct) and the remedial provisions of section 302A.467 discussed earlier, other sections of the act figure predominantly in appellant's claims relating to the Boyer stock. Specifically, appellant states a claim under section 302A.255, which concerns a director's conflict of interest. The language of the statute is quite lengthy, but the reporter's

notes summarize and explain the law embodied therein:

> This section does not replace the existing case law in this state with regard to corporate opportunity. * * * Instead, it deals solely with apparent or actual conflicts of interest inherent in transactions between the corporation and the director or any other organization in which the director participates as a director, officer, or other representative or has a material financial interest. Transactions of this sort will not be void or voidable if the director establishes that the transaction is fair or if certain disclosures are made and certain consents are received. This section states explicit standards for meeting those requirements. This does not mean that all transactions that do not comply with this section are automatically void or voidable, and the courts are free to deal with those transactions on a case-by-case basis.

Minn.Stat.Ann. § 302A.255 (West 1985) (Reporter's Notes). The facts and allegations set forth in the amended complaint relating to Mike Lynn's attempt to gain control of Vikings II through the establishment of a "sham" trust and agreements with other directors and shareholders designed to promote his personal interests clearly support appellant's claim under section 302A.255.

▮ Perhaps the provision of chapter 302A which provides appellant with the broadest ground on which to seek relief is section 302A.751. The statute reads in part:

> A court may grant any equitable relief it deems just and reasonable in the circumstances or may dissolve a corporation and liquidate its assets and business:
>
> \* \* \* \* \* \*
>
> (b) In an action by a shareholder when it is established that:
>
> \* \* \* \* \* \*

> (2) the directors or those in control of the corporation have acted fraudulently, illegally, or in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders, directors, or officers, or as employees of a closely held corporation;
>
> \* \* \* \* \* \*

Minn.Stat. § 302A.751, subd. 1(b)(2) (1988). As initially adopted in 1981, subdivision 1(b)(2) used the words "persistently unfair" instead of today's "unfairly prejudicial." *See* Minn.Stat. § 302A.751, subd. 1(b)(2) (1982). The reporter's notes outline the general intent of the section: "In the past the courts may have been reluctant to order intermediate relief absent some sort of statutory authority. This section provides explicit statutory authority; that authority is meant to be used." Minn.Stat.Ann. § 302A.751 (West 1985) (Reporter's Notes). When amended to its present form in 1983, this section of chapter 302A was changed, along with other provisions, to reflect the legislature's concern that minority shareholders be protected more than they were under current law.[3] "Unfairly prejudicial" was designed to liberalize the remedies available to oppressed shareholders. Professor Joseph Olson of Hamline Law School explained the language change to a Senate subcommittee as "offering the courts a new term in the context of expanded powers." Hearing on S.F. 964 before Senate Judiciary Committee, Judicial Administration Subcommittee, 1983 Minn.Legis., April 6 (audiotape). Professor Olson also explained that "[t]he broad scope of Section 751 reflects the Legislature's trust in the ability of the judiciary to achieve equitable results on the facts appearing in individual cases." Olson, *Statutory Changes Improve Position of Minority Shareholders in Closely–Held Corporations*, The Hennepin Lawyer, Sept.–Oct. 1983, at 11. Shareholders, especially minority shareholders, have a right to be pro-

---

**3.** In introducing the 1983 amendment to the House committee, Representative Bob Ellingson stated: "What we're doing with this bill in some sections is guaranteeing those shareholder rights, especially for minority shareholders." Hearings on H.F. 1021 before House Commerce and Economic Development Committee, 1983 Minn.Legis., April 19 (audiotape). Other shareholder protections of the 1983 amendments included protection of cumulative voting rights and pre-emptive share purchase rights. *See* 1983 Minn.Laws ch. 368.

tected from the mistreatment of those who control the corporation. Chapter 302A in general and section 751 specifically are designed to guarantee that protection.

The legislature has assisted the courts in determining what is "unfairly prejudicial" by including in section 751 a subdivision relating to the duties of a shareholder in a closely held corporation: [4]

> In determining whether to order equitable relief, dissolution, or a buy-out, the court shall take into consideration the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner in the operation of the corporation and the reasonable expectations of the shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other.

Minn.Stat. § 302A.751, subd. 3a (1988).

When section 751 is applied to allegations in the amended complaint concerning the Boyer trusts and agreements, it is clear that there exists an issue of material fact whether respondent officers, directors and shareholders acted in a manner unfairly prejudicial towards PJ. The fiduciary duties outlined in section 302A.751, subdivision 3a necessarily apply to a corporation like Vikings II, which has only three voting shareholder interests. A breach of those duties by the controlling group may be unfairly prejudicial towards the other shareholders. The Minnesota Business Corporation Act was designed to protect vulnerable minority shareholders from exactly the type of unfair oppressive conduct which appellant alleges in this case.

### III.

█ Appellant alleges that respondents acted in a fraudulent, illegal and unfairly prejudicial manner and otherwise breached their fiduciary duties by refusing to pursue and enforce a right of first refusal in favor of Vikings II with regard to the purchase of the Boyer stock. Appellant argues that the December 1985 agreement between Skoglund and the Boyer trustees, in essence, reactivated the 1977 and 1984 right-of-first-refusal agreements which this court held unenforceable in *Winter v. Skoglund,* 404 N.W.2d 786 (Minn.1987). The trial court dismissed appellant's claims on the basis of collateral estoppel.

I would find that there remains a question of fact as to the intent of Skoglund and the Boyer trustees when they included language in the December 1985 agreement validating the earlier right-of-first-refusal agreements. If they intended to create a right of refusal in favor of Vikings II in that document or were under the belief that such a right existed, they breached their fiduciary duty to the corporation by not trying to enforce it. Moreover, because there are questions of law and fact surrounding the effect of the December 1985 agreement, the respondents were under a duty to act in the corporation's best interest and advocate its enforcement.

Appellant should have the opportunity to litigate the effect of respondents' actions occurring after the facts considered in *Winter* which relate to a right of first refusal. The simple fact that respondents vigorously asserted that such a right existed in the *Winter* litigation, whereas now, even after formally acknowledging the right in subsequent documents, they seek to avoid the obligation, suggests a breach of fiduciary duty.'

In conclusion, the voting shareholders in Vikings II owe a duty towards one another to act in good faith in an honest, fair and reasonable manner with the best interests of the corporation in mind. Chapter 302A has provided minority shareholders a remedy to abuses of corporate control and oppression that did not exist in Minnesota before 1981. Appellant must be given an opportunity to pursue its claims.

I also strongly suggest that one of the equitable remedies the trial court should consider is to impose a constructive trust in favor of Vikings II with regard to the corporation's stock indirectly controlled by

---

[4.] Under Minnesota law, a closely held corporation is a corporation which does not have more than 35 shareholders. Minn.Stat. § 302A.011, subd. 6a (1988).

Mike Lynn. Constructive trusts are designed to correct abuses of fiduciary relationships and force a conveyance to prevent unjust enrichment. *See Wright v. Wright*, 311 N.W.2d 484, 485 (Minn.1981); *Gerdin v. Princeton State Bank*, 414 N.W.2d 765, 768 (Minn.App.1987). If it is found at trial that Mike Lynn usurped a corporate opportunity or otherwise violated his fiduciary duties to Vikings II or its shareholders, equity requires that he be precluded from benefiting from his misconduct. Any property or profit he received from taking improper advantage of his fiduciary relationship should be subject to a constructive trust in favor of the corporation.

It is possible that a trial will reveal that corporate history requires an equal division of the corporation's stock between the two competing interests. While counsel for the Lynn interest suggests that such a result would be detrimental, it is certainly no more destructive to the corporation or shareholders than the current litigation. A remedy placing the shareholders back on equal grounds, as they were before Mike Lynn's entanglement, would force compromises between the two groups for their own benefit as well as the good of the corporation and the public.

In conclusion, I would hold:

1. That the trial court's granting of summary judgment on the facts before it was premature;

2. That the leading opinion places too great an emphasis on the *Miller* case, which is no longer the law in Minnesota after the passage of chapter 302A;

3. That, even if there is merit in the holding of the leading opinion that PJ's claims are derivative, PJ retains the same rights Winter, its assignor, would have had to bring suit and, on that ground alone, the trial court's action was erroneous; and

4. That there is not enough in the record in this case to determine what PJ knew and when it knew it. Accordingly, the continuing-wrong exception to the contemporaneous ownership requirement may apply in this case, at least with respect to the Lynn employment contract.

In any event, since the majority agrees that a remand of this case is necessary to determine whether there was a right of first refusal to purchase Viking stock, why not adjudicate all the issues raised in this lawsuit, including:

(1) abuse of corporate control and breach of fiduciary duty by Lynn;

(2) claimed abuse of corporate control and assets by officers and directors;

(3) impropriety and abuse of corporate control in connection with the Lynn employment contract;

(4) the claimed excessive compensation and use of corporate assets for non-corporate use.

I believe that the public is getting fed up with unethical conduct and misuse of funds whether by public officials or business entities which dominate major sporting events paid for by the public both directly and indirectly. In response to these public concerns, the legislature addressed the type of disruptive and manipulative misconduct exhibited in this case by amending chapter 302A, which the leading opinion either choses to ignore or misinterpret. I would reverse the trial court and remand for trial on all issues. Since the trial court must go into great detail on the corporate operations for the past ten years on remand, it would be well advised to consider all issues at that time in the interest of judicial economy.

POPOVICH, Chief Justice (dissenting).

I join in the dissent of Justice YETKA.

WAHL, Justice (dissenting).

I join the dissent of Justice YETKA.

KEITH, Justice (concurring in part, dissenting in part).

I concur in Section I and dissent in Section II of the lead opinion.

*I.* Claims Arising from the Pre–July 21, 1986 Events

The appellant PJ Acquisition Corporation (hereafter known as PJ) makes separate claims relating to the misconduct of the respondents occurring before PJ acquired its shares on July 21, 1986 and misconduct occurring after that date.

The record is clear that the claims asserted by PJ are derivative in nature. These claims fail to allege any direct injury to appellants as shareholders. Rather, they claim injury to the corporation, Vikings II. The dissent appears to agree that the claims are derivative but asserts that Minn. Stat. ch. 302A as amended in 1983 make equitable relief possible.

A careful review of the available legislative history of the 1983 amendments to Minn.Stat. § 302A makes clear that the Legislature wanted to expand protection of minority shareholders from unfair conduct by corporate directors or officers. The amendments to Minn.Stat. § 302A.751 apply to shareholders' suits which seek individual redress, not redress for injury to the corporation itself. This history makes no mention of derivative claims and Minn.Stat. § 302A.751 as amended in 1983 makes no mention of derivative claims. Clearly, Minn.Stat. § 302A.751 has not superseded Rule 23.06 of the Minnesota Rules of Civil Procedure.

Rule 23.06 requires that a shareholder bringing a claim to enforce a right of the corporation must have owned the stock at the time of the alleged misconduct. This rule prevents plaintiffs from purchasing stock for the sole purpose of bringing a derivative claim. It would not make sense to permit a plaintiff to avoid this requirement of Rule 23.06 simply by characterizing this derivative claim as a violation of § 302A.751. This was not the result intended by the 1983 amendments to the statute. Thus, the claims of misconduct occurring before PJ acquired its stock were properly dismissed by the district court.

The dissent argues that claims of misconduct arising out of the 1984 Lynn employment contract can be maintained because the Board of Directors of Vikings II voted on September 2, 1987, after PJ acquired its stock, to affirm this contract. Acts of misconduct often have effects which last many years. However, "what must be decided is when the specific acts of alleged wrongdoings occur, not when their effect is felt." 13 *Fletcher Cyclopedia of the Law of Corporations,* § 5982, p. 234 (perm.rev.ed. 1984). Here, the contract was consummated before PJ was a shareholder and PJ knew of the contract when it acquired its shares. This does not constitute a continuing wrong simply because payments are currently made under the contract. Neither does the Board of Directors' later affirmation of the contract constitute a continuing wrong. The dissent's approach would expand the analysis of the "continuing wrong" theory to a point where the contemporaneous ownership required of Rule 23.06 is undermined. The facts of this case do not bring PJ's claims within the "continuing wrong" exception and all claims relating to the Lynn employment contract were properly dismissed.

*II.* Claims Arising from Post–July 21, 1986 Events

The remaining claims allege that respondents' officers and directors breached fiduciary duties owed by them to PJ and Vikings II in connection with various actions taken to transfer, after July 21, 1986, the original Boyer Trust stock to the Boyer Daughters Trust and ultimately to BWDL Associates, a partnership.

The lead opinion concludes that under the facts of this case, this stock acquisition was not a corporate opportunity and therefore the transfer of this stock breached no legal duties the officers and directors owed to the corporation.

PJ claims that the acquisition of the Boyer shares was a corporate opportunity which the respondents as officers and directors of Vikings II had usurped or appropriated to their own profit. PJ argues that there is a fact issue as to whether the shareholders of Vikings II had a preexisting policy of first offering available stock to the corporation. The dissent clearly points out that the 1983 amendments to Minn.Stat. § 302A provide minority share-

holders with additional protection from oppressive conduct by majority shareholders. These amendments require that shareholders in a closely held corporation owe each other a duty to act fairly and honestly apart from their specific contractual and statutory duties. Minn.Stat. § 302A.751, subd. 3(a) (1988). If the shareholders of Vikings II had an unwritten expectation that available shares would first be offered to the corporation, then the acts of the respondents may have violated their fiduciary duty. This is clearly a question of fact and summary judgment in favor of the defendants was improper and should have been denied.

In summary, I concur with Section I of the lead opinion and dissent from Section II.